**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LIFE AFTER HATE, INC., a/k/a EXITUSA, | |
| Plaintiff, | Case No. |
| v. | |
| FREE RADICALS PROJECT INC. and CHRISTIAN PICCIOLINI, | |
| Defendants. | <u>Jury Trial Demanded</u> |

## COMPLAINT

Plaintiff LIFE AFTER HATE, INC., a/k/a EXITUSA ("Plaintiff"), by and through its undersigned attorneys, hereby brings this Complaint against Defendants FREE RADICALS PROJECT INC. and CHRISTIAN PICCIOLINI. In support thereof, Plaintiff states as follows:

## PARTIES

1.      Plaintiff is an Illinois not-for-profit corporation with a principal place of business at 917 West Washington Blvd., Suite 212, Chicago, Illinois 60607. Plaintiff filed for an assumed name, "EXITUSA", with the Illinis Secretary of State on April 19, 2014 and renewed it on July 8, 2015.

2.      Defendant Free Radicals Project Inc. ("Defendant FRP") is an Illinois not-for-profit corporation with a principal place of business in or near Chicago, Illinois.

3.      Defendant Picciolini is a resident of Illinois.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§1331, 1338 (for claims arising under 15 U.S.C. §1114 of the Lanham Act). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1338, 1367.

5.     This Court has specific personal jurisdiction over Defendants because they have engaged in conduct, giving rise to the claims herein, that satisfies the Illinois long-arm statute (735 ILCS 5/2-209), including the commission of tortious acts within Illinois.  Specifically, Defendants stole and currently unlawfully use a domain name to redirect online traffic to the website of their competing business, which they operate in Illinois; Defendants have also infringed and continue to infringe on Plaintiff's federally registered trademarks.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b)(2) and 1391(e) as both Defendants reside in this district and a substantial amount of the complained-of conduct occurred in this district.

## FACTUAL BACKGROUND

7.     Founded in 2011, the Chicago-based Life After Hate a/k/a "ExitUSA" ("LAH") is a non-profit organization that follows the model of the "exit" programs developed in Europe during the 1990's to help individuals exit hate groups through education, interventions, academic research, and outreach.

8.     Although it started as an online magazine and blog, with immediate and widespread interest and support, it quickly transitioned into an organization dedicated to providing education and social services, including classes, workshops, seminars and lectures, social counseling, personal development counseling, self-improvement counseling, non-profit social networking services, supportive emotional counseling, and emotional support to current and former hate group members and at-risk-youth to assist them in the process of de-radicalization.  Today, thousands of people around the globe support the organization.

9.     By February of 2014, after Angela Kind and Tony McAleer had been developing an assessment tool and transition program for over a year, LAH created an exit program called

2

"ExitUSA." Indeed, in April of 2014, it filed for a d/b/a for "ExitUSA" with the Illinois Secretary of State's Office.

10. In early 2015, LAH began working with Gravitytank, and innovation consultant and design firm, on branding and marketing strategies for its ExitUSA program.

11. LAH won an award for its research on violent extremism in September of 2014; in June of 2016, LAH was awarded a $400,000 federal grant; in December of 2016, LAH's "There is Life After Hate" public service announcement won an Emmy; in May of 2017, NFL star and social activist Colin Kaepernick donated $50,000 to LAH; and, in September of 2017, LAH executive director Sam Rangel was honored as one of the "Everyday Heroes" from the Global Campaign Against Violent Extremism and Intolerance in New York City.

### Defendant Picciolini's Involvement with LAH

12. Defendant Picciolini, along with Arno Michaelis, Sammy Rangel, Angela King, and Frank Meeink, were the five founding members of the non-profit corporation Life After Hate, Inc.

13. Defendant Picciolini sat on LAH's Board of Directors and in 2012 became the administrator of the organization's digital assets, including its domain names.

14. In early 2015, after not getting a government job he vied for, Defendant Picciolini assumed the role of Chairman of the Board of LAH and began overseeing video production.

15. Also in 2015, while LAH was working with Gravitytank on branding, Defendant Picciolini—on behalf of LAH—negotiated with the owner of <www.exitusa.org> ("the Domain Name") to purchase it for $500.

16. In February of 2015, Defendant Picciolini drew a $500 cashier's check from LAH for reimbursement of his purchase of the Domain Name on behalf of LAH. *See* Exhibit 1. The

Domain Name was transferred to LAH's professional GoDaddy account and was used to house the organization's official ExitUSA program's landing page.

17.     In the Fall of 2016, without LAH's (or its other officers' or employees') knowledge, Defendant Picciolini transferred the Domain Name to his personal account.

18.     In 2017, Defendant Picciloni began engaging in activities not sanctioned by LAH that ran directly contrary to the organization's policies and mission: He tried coercing and threatening individuals who were members of white supremacy groups to exit the groups, which resulted in one white supremist posting a YouTube video about Defendant Picciloni's methods.

19.     LAH then discovered that Defendant Picciloni was participating in outreach efforts without LAH's knowledge or sanction, even though he had no formal training when it came to conducting outreach.

20.     After drawing unwanted attention to LAH through his inflammatory political social media postings, Defendant Picciloni then began engaging in quarrels with other LAH Board Members.

21.     Soon thereafter, in early 2017, Defendant Picciloni refused to turn over administrative access to LAH's online accounts, including its websites, email, Facebook accounts, YouTube accounts, Twitter accounts, and banking accounts.

22.     In April of 2017, the cofounders of LAH convened to discuss LAH's issues with Defendant Picciloni directly.

23.     In June of 2017, after threatening to split up the organization and after blackmailing one of LAH's Board Members, Defendant Picciloni demanded all of the other Board Members resign and turn over LAH to him.

24.     On August 21, 2017, Defendant Picciloni violated LAH's confidentiality and privacy agreements by posting about a rape victim on social media.  As a result, LAH demanded that Defendant Picciloni turn over all online assets and suspends him.

25.     Defendant Picciloni turned over all LAH online accounts and assets except for the Domain Name; nevertheless he promised to transfer the Domain Name as soon as he got the chance.  *See* Exhibit 2.

26.     On August 23, 2017, Defendant Picciloni told LAH that he was going to take a "temporary sabbatical" from LAH until certain "workplace grievances" were properly addressed.

27.     Later that day, he emailed the President of LAH to suggest LAH "spin off ExitUSA" to him and asked for seed money of $50,000 to start his own independent organization.

28.     He then veiledly threatened that firing him would "cause confusion" and "raise questions" and warned that if he walked away without anything, it would "seem highly suspect" and would "be the end of LAH in the public and our partners' eyes."

29.     After LAH rejected his thinly veiled extortion threat, Defendant Picciloni just three days later revoked the permission of LAH to use the Domain Name.

30.     Defendant Picciloni then launched his own ExitUSA website on the Domain Name.

31.     LAH immediately received complaints from fellow organizations and members confused about the Domain Name.

32.     On or around September of 2017, Defendant Picciloni moved all of the LAH's ExitUSA accounts to his personal Gmail.

33.     Six weeks later, on November 13, 2017, Defendant Picciloni attempted to fraudulently federally register EXITSUSA by submitting an application to the United States Patent and Trademark Office ("the UPSTO").  *See* Exhibit 3.

34. The USPTO refused to register Defendant Picciloni's mark and rejected his application, citing Plaintiff's identical mark for the same services. *See* Exhibit 4 .

### **Defendants' Competing Company**

35. Since the second half of 2017, Defendants have operated a business directly competing with LAH's services while using the Domain Name to direct to their website and while including the phrase "LIFE AFTER HATE" prominently on the top of their website's homepage.

36. Since that time, Defendants have purloined Plaintiff's members and potential members and, as a result, have stolen tens of thousands of dollars of Plaintiff's income and completely usurped control over its goodwill.

37. Unless the Court immediately enjoins Defendants from using the infringing Domain Name, consumers will be increasingly deceived and Plaintiff's trademarks will be increasingly worthless. Plaintiff must be compensated for its lost income and damages to its business and goodwill that have incurred to date and that continue to accrue.

### **Actual Confusion**

38. Numerous members and non-members of Plaintiff's organization have reached out to Plaintiff through email, Facebook, and in person to express confusion about www.exitusa.org and whether Defendants are associated with Plaintiff. Additionally, when searching for "EXITUSA" via an online search engine, consumers are confused by the search engines results that list Defendants' Twitter handle, which reads "ExitUSA (Now @FreeRadicalsOrg)." *See* Exhibit 5.

### Count I
### **FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)**

39. Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-38.

40.     Plaintiff, the lawful owner and exlusive holder of the follow federal trademark registrations: LIFE AFTER HATE (Reg. No. 5479674), LIFE AFTER HATE & Design (Reg. No. 5479674), and EXITUSA (Reg. No. 5479677), all used in connection with educational and social services.  *See* Exhibits 6-8.

41.     "LIFE AFTER HATE" and "EXIT USA" are suggestive marks, as they suggest— but do not immediately convey—Plaintiff's educational and social services.

42.     The United States Patent and Trademark Office ("the USPTO") deemed LFIE AFTER HATE, LIFE AFTER HATE & Design, and EXITUSA inherently distinctive of Plaintiff's services and therefore registered the mark on the Principal Register.  *See* Exhibits 6-8.

43.     In 2017, without Plaintiff' authorization, Defendant Picciloni stole the Domain Name and began using it for a countified ExitUSA website and organization.

44.     Then in 2018, again without the Plaintiff's authorization, Defendants began using the Domain Name to redirect to his directly competing website, <freeradical.org>.

45.     Even more confusing, Defendants used the phrase "LIFE AFTER HATE" prominently on the top middle part the homepage of the website.  *See* Exhibit 9.

46.     Defendants' use of Plaintiff's EXITUSA and LIFE AFTER HATE marks for a competing service directly infringes on Plaintiff's federally registered trademarks.

47.     Defendants purposely chose to use Plaintiff's marks in order to purloin loyal members and potential members of Plaintiff's organization and to free ride off of Plaintiff's well-known brand.

48.     Defendants' provision of the same exact services, using Plaintiff's identical marks, in the same geographical area, through the same channels of trade (an online website), has caused and is likely to continue to cause confusion, mistake, or deception as to the source of origin,

sponsorship, or approval of Plaintiff's services, in that the general public, trade, and others are likely to believe that Defendants' services emanate from Plaintiff or are legitimately connected with, approved by, or related to Plaintiff.

49. Defendants' aforesaid usage of Plaintiff's trademarks for their services constitutes the use of a false designation of origin and false representation that Defendants' business and services are legitimately affiliated, connected, or associated with the Plaintiff, in violation of Section 32 of the United States Trademark Act, 15 U.S.C. § 1114.

50. Actual confusion in this case is widespread.

51. Defendants' communications and actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill and commercial magnetism associated with the Plaintiff's marks to the great and irreparable injury of Plaintiff.

52. Even though Plaintiff has asked Defendants to return the Domain Name numerous times, Defendants have continued to hold and use the Domain Name in a way that creates consumer confusion.

53. Defendant have made clear that they intend to hold and use the domain name and redirect it to their directly competing and confusing website unless restrained by this Court.

54. Defendants' aforesaid acts greatly and irreparably damage Plaintiff and will continue to damage Plaintiff unless Defendants are enjoined by this Court, and so Plaintiff is without an adequate remedy at law.

WHEREFORE, Plaintiffs pray that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendants as follows:

(a) Preliminary and permanent injunctive relief against Defendants, enjoining them and their partners and agents from using the Domain Name;

8

(b) Plaintiff's damages to associated with Defendants' unlawful actions, in an amount to be determined at trial, but in no event less than $25,000;

(c) Plaintiffs' cost and reasonable attorneys' fees in the Court's discretion.

(d) Both pre-judgment and post-judgment interest; and

(e) Such other and further relief as this Court finds just and equitable.

**Count II**
**TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY (Common Law)**

55.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 54 herein.

56.     Plaintiff had valid business relationships with its members.

57.     Defendants knew about Plaintiff's business relationships with its members.

58.     Defendants have intentionally interfered with Plaintiff's business relationships by redirecting individuals looking for Plaintiff's website and services to Defendants' website that offers competing services and by further misleading those individuals by intentionally using Plaintiff's LIFE AFTER HATE mark in big letters on their homepage.

59.     Plaintiff has suffered damages as a result of Defendants' tortious interference with Plaintiffs' business relationships.

60.     Defendants' aforesaid acts greatly and irreparably damage Plaintiff and will continue to damage Plaintiff unless enjoined by this Court, as Plaintiff is without an adequate remedy at law.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendants that includes the following:

(a) Damages to Plaintiff in an amount to be determined at trial, but in no event less than $25,000;

(b) Costs, attorney fees, investigatory fees, and expenses to the full extent provided by applicable law;

(c) Both pre-judgment and post-judgment interest; and,

(d) Such other and further relief as this Court finds just and equitable.

**Count III**
**DECEPTIVE TRADE AND BUSINESS PRACTICES (815 ILCS 510/1, et seq.)**

61.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 60 herein.

62.      Defendants' aforesaid acts violate the Uniform Deceptive Trade Practices Act of the state of Illinois, 815 ILCS 510/1--510/7, and similar laws in the states where Defendants sold competing services using a domain name and website material intentionally designed to deceive consumers.

63.     Defendants' aforesaid acts violate the Consumer Fraud and Deceptive Business Practices Act of the state of Illinois, 815 ILCS 505/1--505/12.

64.     Defendants' aforesaid acts greatly and irreparably damage Plaintiff and will continue to damage Plaintiff unless enjoined by this Court, as Plaintiff is without an adequate remedy at law.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendants that includes the following:

(a) a preliminary and permanent injunction;

(b) Costs, attorney fees, investigatory fees, and expenses to the full extent provided by applicable law;

(c) Both pre-judgment and post-judgment interest; and,

(d) Such other and further relief as this Court finds just and equitable.

**Count IV**
## VIOLATION OF ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT (15 U.S.C. §1125(d))

65.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-64.

66.     Defendant Picciolini registered and Defendants thereafter used and renewed the the Domain Name in bad faith and with full knowledge of Plaintiff's use of and ownership of its EXITUSA name and service mark.

67.     Defendants commercially use the Domain Name to purloin Plaintiff's members and prospective members and to profit from the goodwill of Plaintiff's name and mark.

68.     Defendants' aforesaid registration and use of the Domain Names violates the Anti-cybersquatting Consumer Protection Act, Section 43(d) of the United States Trademark Act, 15 U.S.C. §1125(d).

69.     Defendants' aforesaid acts greatly and irreparably damage Plaintiff and will continue to damage Plaintiff unless enjoined by this Court; wherefore, Plaintiff is without an adequate remedy at law.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendants that includes the following:

(a)   Transfer of the Domain Name to Plaintiff;

(b)   Plaintiff's damages associated with Defendants' cybersquatting and unfair competition, in an amount to be determined at trial, but in no event less than $25,000;

(c) Plaintiff's costs and reasonable attorneys' fees in the Court's discretion.

(d) Both pre-judgment and post-judgment interest; and

(e) Such other and further relief as this Court finds just and equitable.

11

**Count V**
**CONVERSION**

70.     Plaintiff realleges and incorporate by reference the allegations set forth in paragraphs 1 through 69 herein.

71.     The Domain Name was purchased for and paid for by Life After Hate, Inc. for $500 in early 2015.

72.     When Defendant Picciolini left the organization in August of 2017, he wrongfully assumed control and ownership of the Domain Name.

73.     Through one of its members, Plaintiff originally registered and ultimately paid for the domain name, which wholly incorporates Plaintiff's registered trademark.

74.     Plaintiff never gave Defendant Picciolini authorization to retain control of the domain name after he left the group and is entitled to immediate possession of the Domain Name.

75.     Plaintiff has demanded the return of the domain name from Defendant Picciolini but he has refused to return the Domain Name.

WHEREFORE, the Owner Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendant Picciolini that includes the following:

(a) Return of the unlawfully retained domain name;

(b) Damages of $10,000;

(c) Costs, attorney fees, investigatory fees, and expenses to the full extent provided by applicable law;

(d) Both pre-judgment and post-judgment interest; and,

(e) Such other and further relief as this Court finds just and equitable.

## Count VI
## <u>UNJUST ENRICHMENT (In the Alternative)</u>

76.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 75 herein.

77.     After leaving LAH, Defendant Picciolini unlawfully retained the domain name <exitusa.org> and has since kept and use the domain name, being unjustly enriched therefrom.

78.     The cost to purchase a similar domain name, <exitusa.com> is approximately $10,000.

WHEREFORE, the Owner Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendant Picciolini that includes the following:

(c) Return of the unlawfully retained domain name;

(d) Compensation of $10,000;

(c) Costs, attorney fees, investigatory fees, and expenses to the full extent provided by applicable law;

(f)  Both pre-judgment and post-judgment interest; and,

(e) Such other and further relief as this Court finds just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury on all issues so triable.

Dated: October 17, 2018

Respectfully submitted,

LIFE AFTER HATE, INC., a/k/a EXITUSA

By: /s/ Daliah Saper
`                                   Daliah Saper
Bar No. 6283932
Saper Law Offices, LLC
505 North LaSalle, Suite 350
Chicago, IL 60654

Telephone: 312-527-4100
ds@saperlaw.com

Matthew Grothouse
Bar No. 6314834
Saper Law Offices, LLC
505 N LaSalle, Suite 350
Chicago, IL 60654
Telephone: 312-527-4100
matt@saperlaw.com