**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LIFE AFTER HATE, INC., a/k/a EXITUSA, <br><br> Plaintiff, <br><br> v. <br><br> FREE RADICALS PROJECT INC. and CHRISTIAN PICCIOLINI, <br><br> Defendants. | Case No. 18-cv-06967 <br><br> Hon. Virginia M. Kendall |

**MEMORANDUM IN SUPPORRT OF PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION**

This is an action for federal unfair competition, tortious interference with a business expectancy, deceptive trade practices (815 ILCS 510/1--510/7), Illinois common law unfair competition, violations of the Anti-cybersquatting Protection Act under the United States Trademark Act (15 U.S.C. §§1051-1127), conversion, and unjust enrichment.

Plaintiff, Life After Hate, Inc. a/k/a "ExitUSA" ("Plaintiff") is the lawful owner of the federally registered LIFE AFTER HATE and EXITUSA trademarks, as well as the <www.exitusa.org> domain name ("the Domain Name") at issue in this lawsuit. Defendant Christian Picciolini is a former member of Plaintiff who left the organization, stole the domain name at issue, and began using the Domain Name to redirect to his competing organization—"Free Radicals Project Inc." Defendants have been and are to this day purloining Plaintiff's online traffic by using the stolen Domain Name to redirect users to a competing organization using the LIFE AFTER HATE mark.

Plaintiff has filed a Motion for Preliminary Injunction to prevent Defendants from further confusing members and potential members into believing that Defendants' organization is

authorized by or otherwise associated with Plaintiff, as well as to stop Defendants from purloining Plaintiff's online traffic and producing initial interest confusion, for the pendency of the lawsuit.

**FACTUAL BACKGROUND**

Founded in 2011, the Chicago-based Life After Hate a/k/a "ExitUSA" ("LAH") is a non-profit organization that follows the model of the "exit" programs developed in Europe during the 1990's to help individuals leave hate groups through education, interventions, academic research, and outreach. *See* Compl. ¶ 7. Although it started as an online magazine and blog, with immediate and widespread interest and support, it quickly transitioned into an organization dedicated to providing education and social services, including classes, workshops, seminars and lectures, social counseling, personal development counseling, self-improvement counseling, non-profit social networking services, supportive emotional counseling, and emotional support to current and former hate group members and at-risk-youth to assist them in the process of de-radicalization. *See* Compl. ¶ 8. Today, thousands of people around the globe support the organization. *See* Compl. ¶ 8.

By February of 2014, after Angela Kind and Tony McAleer had been developing an assessment tool and transition program for over a year, LAH created a program called "ExitUSA." *See* Compl. ¶ 9. Indeed, in April of 2014, Plaintiff filed for a d/b/a for "ExitUSA" with the Illinois Secretary of State's Office. *See* Compl. ¶ 9. In early 2015, LAH began working with Gravitytank, an innovation consultant and design firm, on branding and marketing strategies for its ExitUSA program. *See* Compl. ¶ 10.

LAH won an award for its research on violent extremism in September of 2014; in June of 2016, LAH was awarded a $400,000 federal grant; in December of 2016, LAH's "There is Life After Hate" public service announcement won an Emmy; in May of 2017, NFL star and social

activist Colin Kaepernick donated $50,000 to LAH; and, in September of 2017, LAH executive director Sam Rangel was honored as one of the "Everyday Heroes" from the Global Campaign Against Violent Extremism and Intolerance in New York City. *See* Compl. ¶ 11.

Defendant Picciolini sat on LAH's Board of Directors and in 2012 became the administrator of the organization's digital assets, including its domain names. *See* Compl. ¶ 13. In early 2015, after not getting a government job he vied for, Defendant Picciolini assumed the role of Chairman of the Board of LAH and began overseeing video production. *See* Compl. ¶ 14.

Also in 2015, while LAH was working with Gravitytank on branding, Defendant Picciolini—on behalf of LAH—negotiated with the owner of <www.exitusa.org> ("the Domain Name") to purchase it for $500. *See* Compl. ¶ 15. In February of 2015, Defendant Picciolini drew a $500 cashier's check from LAH for reimbursement of his purchase of the Domain Name on behalf of LAH. *See* Compl. ¶ 16, Exh. 1. The Domain Name was transferred to LAH's professional GoDaddy account and was used to house the organization's official ExitUSA program's landing page. *See* Compl. ¶ 16.

In the Fall of 2016, without LAH's (or its other officers' or employees') knowledge, Defendant Picciolini transferred the Domain Name to his personal account. *See* Compl. ¶ 17. In 2017, Defendant Picciloni began engaging in activities not sanctioned by LAH that ran directly contrary to the organization's policies and mission: He tried coercing and threatening individuals who were members of white supremacy groups to exit the groups, which resulted in one white supremist posting a YouTube video about Defendant Picciloni's methods. *See* Compl. ¶ 18. LAH then discovered that Defendant Picciloni was participating in outreach efforts without LAH's knowledge or sanction, even though he had no formal training when it came to conducting outreach. *See* Compl. ¶ 19.

After drawing unwanted attention to LAH through his inflammatory political social media postings, Defendant Picciloni then began engaging in quarrels with other LAH Board Members. *See* Compl. ¶ 20. Soon thereafter, in early 2017, Defendant Picciloni refused to turn over administrative access to LAH's online accounts, including its websites, email, Facebook accounts, YouTube accounts, Twitter accounts, and banking accounts. *See* Compl. ¶ 21. In April of 2017, the cofounders of LAH convened to discuss LAH's issues with Defendant Picciloni directly. *See* Compl. ¶ 22. In June of 2017, after threatening to split up the organization and after blackmailing one of LAH's Board Members, Defendant Picciloni demanded all of the other Board Members resign and turn over LAH to him. *See* Compl. ¶ 23.

On August 21, 2017, Defendant Picciloni violated LAH's confidentiality and privacy agreements by posting about a rape victim on social media. *See* Compl. ¶ 24. As a result, LAH demanded that Defendant Picciloni turn over all online assets and suspended him. *See* Compl. ¶ 24. Defendant Picciloni turned over all LAH online accounts and assets except for the Domain Name; nevertheless he promised to transfer the Domain Name as soon as he got the chance. *See* Compl. ¶ 25, Exh. 2. On August 23, 2017, Defendant Picciloni told LAH that he was going to take a "temporary sabbatical" from LAH until certain "workplace grievances" were properly addressed. *See* Compl. ¶ 26. Later that day, he emailed the President of LAH to suggest LAH "spin off ExitUSA" to him and asked for seed money of $50,000 to start his own independent organization. *See* Compl. ¶ 27. He then veiledly threatened that firing him would "cause confusion" and "raise questions" and warned that if he walked away without anything, it would "seem highly suspect" and would "be the end of LAH in the public and our partners' eyes." *See* Compl. ¶ 28.

After LAH rejected his thinly veiled extortion threat, Defendant Picciloni just three days later revoked the permission of LAH to use the Domain Name. *See* Compl. ¶ 29. Defendant Picciloni then launched his own ExitUSA website on the Domain Name. *See* Compl. ¶ 30. LAH immediately received complaints from fellow organizations and members confused about the Domain Name. *See* Compl. ¶ 31. On or around September of 2017, Defendant Picciloni moved all of the LAH's ExitUSA accounts to his personal Gmail. *See* Compl. ¶ 32.

Six weeks later, on November 13, 2017, Defendant Picciloni attempted to fraudulently federally register EXITSUSA by submitting an application to the United States Patent and Trademark Office ("the UPSTO"). *See* Compl. ¶ 33, Exh. 3. The USPTO refused to register Defendant Picciloni's mark and rejected his application, citing Plaintiff's identical mark for the same services. *See* Compl. ¶ 34, Exh. 4.

Since the second half of 2017, Defendants have operated a business directly competing with LAH's services while using the Domain Name to direct to their website and while including the phrase "LIFE AFTER HATE" prominently on the top of their website's homepage. *See* Compl. ¶ 35. Since that time, Defendants have purloined Plaintiff's members and potential members and, as a result, have stolen tens of thousands of dollars of Plaintiff's income and completely usurped control over its goodwill. *See* Compl. ¶ 36. Numerous members and non-members of Plaintiff's organization have reached out to Plaintiff through email, Facebook, and in person to express confusion about www.exitusa.org and whether Defendants are associated with Plaintiff. *See* Compl. ¶ 38. Additionally, when searching for "EXITUSA" via an online search engine, consumers are confused by the search engines results that list Defendants' Twitter handle, which reads "ExitUSA (Now @FreeRadicalsOrg)." *See* Compl. ¶ 19, Exh. 5.

Plaintiff is the lawful owner and exlusive holder of the following federal trademark registrations: LIFE AFTER HATE (Reg. No. 5479674), LIFE AFTER HATE & Design (Reg. No. 5479674), and EXITUSA (Reg. No. 5479677), all used in connection with educational and social services. *See* Compl. ¶ 40, Exhs. 6-8. Plaintiff respectfully requests the Court to enjoin Defendants during the pendency of the case so their consumer confusion does not escalate, and so their trademark and brand does not altogether disappear.

## ARGUMENT

In order to obtain a preliminary injunction, a movant must show some likelihood of success on the merits; irreparable harm, without an adequate remedy at law; the balance of hardships favors preliminary relief; and the requested relief is not contrary to the public interest. *Meridian Mutual Insurance Co. v. Meridian Insurance Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997). The Court must first assess likelihood of success and irreparable harm; if the movant shows a better than negligible chance of success and irreparable harm, the court will then consider the balance of hardships and public interest. *Id.*

**I.      Plaintiff is Likely to Succeed on the Merits of Its Federal Unfair Competition, Deceptive Trade and Business Practices, and Anti-Cybersquatting Consumer Protect Act Claims.**

The evidence set forth in Plaintiff's Complaint and this Memorandum shows a "better than negligible chance" of success on the merits. *Id.* Plaintiff created and owns the LIFE AFTER HATE and EXITUSA marks at issue, as well as the <www.exitusa.org> domain name, and Defendants have willfully used and will continue to willfully use the LIFE AFTER HATE marks, the EXITUSA marks, and the <www.exitusa.org> domain name in Illinois and elsewhere without authorization from Plaintiff to the confusion of consumers and to the detriment and damage of Plaintiff's business and brand unless enjoined by the Court.

6

A.  Plaintiff's Marks are Entitled to Protection.

To qualify for protection under Section 32 of the Lanham Act (15 U.S.C. § 1114) and the common law, a trademark need only be distinctive. Distinctiveness can arise either because a designation is inherently distinctive or because it has acquired distinctiveness. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

A trademark is inherently distinctive if it is arbitrary, fanciful, or suggestive, rather than merely descriptive or generic of the product with which it is used. *Id.* at 768; *see also Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). The trademarks "LIFE AFTER HATE" and "EXITUSA" are inherently distinctive, as they are not generic terms for education and social services and do not immediately convey or "describe" the nature of such services. Instead, Plaintiff's marks are suggestive and, therefore, inherently distinctive, warranting protection upon initial use. *Wal-Mart Stores Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 210-11 (2000); *United Drug Co. v. Case Theodore Rectanus Co., 248 U.S. 90, 97 (1918).* Additionally, Plaintiff's federal trademark registration provides *prima facie* evidence of the validity of Plaintiff's EXITUSA and LIFE AFTER HATE marks. *See Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 854 (N.D. Ill. 2018) (citing 15 U.S.C. § 115(a)); *See* Compl. ¶ 40, Exhs. 6-8.

B.  Plaintiff Owns the Trademarks At Issue.

1.  *Plaintiff Created and First Used Plaintiff's Trademarks.*

Plaintiff first used LIFE AFTER HATE and EXITUSA in in commerce at least as early as March of 2015. Furthermore, Plaintiff owns federal trademark registrations for LIFE AFTER HATE and EXITUSA, which serve as *prima facie* evidence of Plaintiff's ownership of the marks. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1300 (2015) (citing § 1057(b)).

        2.     *Plaintiff has Priority over Defendants.*

"It is a bedrock principle of trademark law that trademark ownership is not acquired by federal or state registration, but rather from prior appropriation and actual use in the market." *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 665 (7th Cir. 2016) (internal citations and quotations omitted). "It is not essential that its use has been long continued, or that the article should be widely known, or should have attained great reputation." *Id.* at 666.

Here, Plaintiff first created, adopted, and used in commerce its EXITUSA mark in March of 2015, well before Defendants' 2018 first use of the EXITUSA domain name and mark. Additionally, Plaintiff first created, adopted, and used in commerce its LIFE AFTER HATE mark in 2011, well before Defendant's first use if the phrase on its website and Twitter® handle in 2018. Furthermore, Defendant Christian Picciolini is a former member of Plaintiff and without authorization willfully stole the Domain Name from Plaintiff last year.

    C.    <u>Defendants' Unlawful Use of Plaintiff's Trademarks and Domain Name Has Caused and Is Likely to Cause Consumer Confusion.</u>

The test for trademark infringement under Section 32 of the Lanham Act is whether defendant's use of the registered mark is likely to cause confusion, deception or mistake on the part of the consuming public. *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1174 (7th Cir. 1986). In resolving the issue of likelihood of confusion, courts within the Seventh Circuit regularly consider certain "likelihood of confusion" factors. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008).

Because the parties here use virtually identical marks in connection with identical services, the issue of likelihood of confusion is an "open and shut" case. J.T. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:20 (5th ed. 2017). Additionally, a deeper analysis, using all of the likelihood of confusion factors, further supports the high likelihood Plaintiff will

8

succeed on the merits of its trademark infringement claim. The Seventh Circuit has identified seven relevant factors for the likelihood of confusion analysis: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products or services; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to "palm off" his product as that of another. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015) (citing *Bd. of Regents of Univ. of Wis. Sys. v. Phx. In'll Software, Inc.*, 653 F.3d 448, 454 (7th Cir.2011)).

Here, all seven factors favor a likelihood of confusion finding. Specifically, (1) the trademarks in this case are identical, (2) the services are identical, (3) the area and manner of concurrent use is virtually identical (Northeast Illinois), (4) the degree of care likely to be exercised by consumers is low because the food at issue is relatively inexpensive (they are normally free), (5) Plaintiff's trademarks are inherently distinctive and strong, (6) there is evidence of actual confusion, and (7) Defendants clearly intended to palm off and copy Plaintiff's marks, services, entire business. Compl., ¶¶ 7-40.

The common use of trade channels increases the likelihood of confusion. *CAE Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 682 (7th Cir. 2001); *Ty Inc. v. Jones Group Inc.*, 237 F.3d 891, 900 (7th Cir. 2001). Moreover, whereas here, where Defendants' actions manifest wrongful intent, courts will presume that the party will accomplish its purpose of trading on the good will of the prior user. *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 857 (7th Cir. 1982). An inference of wrongful intent "is especially appropriate when the parties have had a prior relationship." *Beer Nuts, Inc. v. Clover Club Foods*, 805 F.2d 920, 927 (10th Cir. 1986); *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 432 (5th Cir. 1984). Defendant Picciolini

was a former member and board director and so intimately knew of Plaintiff's EXITUSA and LIFEAFTER HATE trademarks. Indeed, before he left the organization, Defendant Picciolini demanded that he be given control of the EXITUSA program.

        D.        <u>Plaintiffs Are Likely to Prevail on Anti-Cybersquatting Claim.</u>

Here, Plaintiff owns a federally registered and distinctive mark (EXITUSA), the domain name that Defendants stole and control (www.exitusa.org) fully embodies Plaintiff's EXITUSA mark, and Defendants registered, stole, and now use the Domain Name in bad faith and with the intent to profit from it. Therefore, Plaintiff is likely to prevail on itsAanti-Cybersquatting claim.

**II.    Plaintiff Will Suffer Immediate, Irreparable Harm and Lack a Remedy at Law.**

Irreparable injury is presumed if a showing of likelihood of confusion is made in trademark infringement and unfair competition actions. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000); *Meridian Mutual,* 128 F.3d at 1120. As repeatedly recognized by courts, "[t]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's good." *Processed Plastic Co.*, 675 F.2d at 857, quoting *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir. 1979). The harm caused by copyright infringement is also irreparable and without an adequate remedy at law. *JCW Investments, Inc. v. Novelty, Inc.*, 222 F. Supp. 2d 1030, 1036 (N.D. Ill. 2002). In short, irreparable injury in this case cannot be reasonably questioned.

Beyond presumptions, Defendants' actions are literally destroying Plaintiff's organization because members, prospective members, and the public mistakenly attribute Defendants' bad deeds and conduct to Plaintiff and are otherwise be misled by and redirected to the website of Defendants' competing organization.

10

**III.     The Balance of Hardships Favors Plaintiff.**

In contrast to Plaintiff's interest in protecting its trademarks, domain name, and well-established organization, Defendants have unlawfully usurped Plaintiff's identity and intellectual property and have just recently starting their own organization thus, Defendants cannot claim the presence of any significant consumer loyalty or acceptance in Illinois independent of that of Plaintiff.  *Eli Lilly*, 233 F.3d at 469; *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir. 1986).  Moreover, the injunction requested would not prohibit Defendants from operating a competing organization; the injunction would only require Defendants to stop confusing the public and consumers by mandating that Defendants stop using Plaintiff's trademarks and domain name.  The balance of harms, therefore, favor Plaintiff.  *Eli Lilly*, 233 F.3d at 469; *Meridian Mutual*, 128 F.3d at 1121.

Moreover, Defendants began using the trademarks and domain name with intimate knowledge of Plaintiff's creation and prior use of the trademarks and domain name.  Therefore, Defendants knowingly assumed the risk of unlawfully operating a domain name and unlawfully using Plaintiff's trademarks, and such a voluntary assumption of risk deprives defendants of whatever interest they may claim in continuing to use a mark.  *Ty, Inc. v. Jones Group*, 237 F.3d at 903; *Helene Curtis Industries v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977).  Lastly, Defendants have communicated and demonstrated to Plaintiff that they will continue to use Plaintiff's trademarks and domain name knowing that Plaintiff is selling operating its organization and website with the same name, trademarks, and offering the same services—unless the Court enjoins them.

**IV.     The Public Interest Favors Granting the Preliminary Injunction.**

Courts have long recognized the public interest in protecting the public from confusion and

in protecting trademarks in general. *Eli Lilly*, 233 F.3d at 469; *Hyatt Corp. v. Hyatt Legal Services*, 736 F.2d 1153, 1159 (7th Cir. 1984). Additionally, the public has an interest in preventing cybersquatting. Furthermore, since the likelihood of confusion present here is great, the interest of the public in the Court granting the requested injunction is significantly heightened. On the other hand, the public cannot be harmed in any manner by the issuance of the injunction.

## **CONCLUSION**

For the foregoing reasons, and the reasons expressed in the accompanying declarations and evidence, Plaintiff requests that its Motion for Preliminary Injunction be granted.

Dated: October 17, 2018

    Respectfully submitted,

    LIFE AFTER HATE, INC., a/k/a EXITUSA

    Matthew Grothouse
    Bar No. 6314834
    matt@saperlaw.com
    Dalaih Saper
    ds@saperlaw.com
    Saper Law Offices, LLC
    505 N LaSalle, Suite 350
    Chicago, IL 60654
    Telephone: 312-527-4100

    *Attorneys for Plaintiff.*

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on October 17, 2018, he caused the foregoing to be filed with the Court by electronic filing protocols, and that same will therefore be electronically served upon all attorneys of record registered with the Court's ECF/CM system.

The undersigned attorney further certifies that on October 17, 2018, he caused the foregoing to be served upon the following:

Christian Picciolini: christian@christianpicciolini.com

/s/ Matthew R. Grothouse
Matthew R. Grothouse
Saper Law Offices, LLC
505 N LaSalle, Suite 350
Chicago, IL 60654
Bar No. 6314834
Telephone: 312-527-4100
matt@saperlaw.com

*Attorney for Plaintiffs.*
