**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LIFE AFTER HATE, INC., a/k/a EXIT USA,     ) | |
|     ) | |
| *Plaintiff/Counter-Defendant*,     ) | |
| v.     ) | No. 18 C 6967 |
|     ) | |
| FREE RADICALS PROJECT, INC., and     ) | Hon. Virginia M. Kendall |
| CHRISTIAN PICCIOLINI,     ) | |
|     ) | |
| *Defendants/Counter-Plaintiffs*.     ) | |
|     ) | |
| CHRISTIAN PICCIOLINI,     ) | |
|     ) | |
| *Third-Party Plaintiff*,     ) | |
| v.     ) | |
|     ) | |
| TONY MCALEER, SAMMY RANGEL, AN-     ) | |
| GELA KING and FRANK MEEINK,     ) | |
|     ) | |
| *Third-Party Defendants*.     ) | |
|     ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Life After Hate, Inc. ("LAH") initiated this suit against Defendants Christian Picciolini and Free Radicals Project, Inc. ("FRP"). LAH claims in its amended complaint that Picciolini, one of LAH's co-founders, left LAH and started Free Radicals Project, a competing organization, and began infringing LAH's registered trademarks. (Dkt. 23.) LAH brings claims against Picciolini and FRP for trademark infringement and counterfeiting, tortious interference with a business expectancy, deceptive trade and business practices, cybersquatting, conversion, unjust enrichment, and breach of fiduciary duty. (*Id.*) LAH moved for a preliminary injunction to prevent Picciolini and FRP from using LAH's trademarks, which remains under advisement. (Dkt. 7.) Picciolini and FRP answered LAH's complaint and brought counterclaims against LAH for

copyright infringement, violation of right of publicity, unfair competition, unjust enrichment, conversion, and deceptive trade practices. (Dkt. 35.) Picciolini and FRP also brought claims against LAH and four individual third-party defendants, Tony McAleer, Sammy Rangel, Angela King, and Frank Meeink, each of whom is affiliated with LAH, for tortious interference with a business expectancy, conspiracy, breach of fiduciary duty, and defamation and disparagement. (*Id.*)

LAH and the third-party defendants (which the Court will jointly refer to here as "LAH") now move to dismiss Picciolini and FRP's claims in their entirety, arguing that all claims fail to state a claim for relief under Federal Rules of Civil Procedure 12(b)(6) and 9(b), and that some claims are preempted by the Copyright Act. (Dkt. 92.) For the reasons stated here, the motion to dismiss [Dkt. 92] is granted in part and denied in part. Counts Two, Three, Four, Six, Seven, Eight, and Ten are dismissed without prejudice. Count Five is dismissed with prejudice. Count Nine is dismissed without prejudice as to third-party defendant McAleer only. The motion is denied as to Count One and the remainder of Count Nine.

## BACKGROUND

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). The facts below are drawn from Picciolini and FRP's Counter-Complaint and Third-Party Complaint (Dkt. 35) (the "Complaint") and are accepted as true for purposes of reviewing this motion. *See Vinson v. Vermillion Cty., Ill.*, 776 F.3d 924, 925 (7th Cir. 2015).

Picciolini is a former white supremacist. (Dkt. 35 ¶ 12.) He was recruited to join the Chicago Area Skinheads in 1987, when he was 14 years old, and later became the group's leader. (*Id.* ¶ 13.) In 1996, Picciolini extricated himself from white-supremacist groups and renounced

his ties to extremist groups and racism. (*Id.* ¶ 14.) Since then, Picciolini has devoted his efforts to helping other individuals disengage from extremist movements. (*Id.* ¶ 15.) To do so, Picciolini relies on his 20-plus years of experience and consultations with psychologists, social workers, life coaches, mental health professionals, and law enforcement. (*Id.*)

In 2009, Picciolini co-created and co-founded LAH with Arno Michaelis. (*Id.* ¶ 17.) At that time, he began using "Life After Hate" as a name for a platform and his services advocating against hate and extremist groups, in the hopes that members of those groups would renounce their ties as Picciolini and Michaelis had. (*Id.*) In January 2010, Picciolini and Michaelis launched the websites lifeafterhate.org and kindnessnotweakness.org to support LAH. (*Id.* ¶ 19.) In 2011, Picciolini and Michaelis invited the four individual third-party defendants to join LAH as volunteers. (*Id.* ¶ 22.) Three of the individuals later became members of LAH's Board. (*Id.*) In August 2012, Picciolini stepped down from his position as LAH Board Chair but remained a member of the Board. (*Id.* ¶ 23.)

In November 2012, Michaelis left LAH. (*Id.* ¶ 24.) Michaelis and Picciolini had personal control over LAH's assets, including its intellectual property, and Michaelis transferred all such assets, including LAH's website, digital assets, and domain names, to Picciolini when he left. (*Id.* ¶ 25.) Picciolini became the interim executive director of LAH at this time and stepped down from his Board member role. (*Id.*) After Michaelis's departure, Picciolini decided to restructure and rebrand LAH as a service provider of intervention and prevention services for extremists. (*Id.* ¶ 26.) Under Picciolini's guidance, LAH began engaging in "exit" programming to help extremists disengage from violence-based extremist groups. (*Id.*) Picciolini solely developed and operated the LAH exit program, which eventually became known as "ExitUSA." (*Id.*) Picciolini has helped more than 250 individuals disengage from violent extremism and hateful ideologies. (*Id.*)

In 2014, Picciolini created, established, and used the "ExitUSA" trademark as part of the exit program he developed and operated through LAH. (*Id.* ¶ 30.) In June 2014, he launched "ExitUSA" on various social media platforms. (*Id.* ¶ 31.) As part of his efforts to develop the program, Picciolini sought to personally purchase the domain name ExitUSA.org. (*Id.* ¶ 32.) In January 2015, Picciolini learned that someone else already owned the domain name, and he negotiated the purchase of the domain name from the original owner. (*Id.* ¶ 33.) In March 2015, Picciolini personally redesigned LAH's website, logo, marketing materials, videos, and website content, which LAH continues to use. (*Id.* ¶ 35.) In 2017, Picciolini redeveloped, redesigned, and relaunched the "ExitUSA" website. (*Id.* ¶ 42.)

In April 2017, LAH members decided to separate the operations and programs of ExitUSA from LAH. (*Id.* ¶ 65.) They agreed to establish ExitUSA as a subsidiary corporation of LAH to be operated by Picciolini, who was already overseeing and providing LAH's counseling services and programs. (*Id.*) Picciolini agreed to step down from LAH's Board at this time. (*Id.*) Later that month, following a dispute between Picciolini and the four individual third-party defendants, three of the individuals removed Picciolini's access to LAH databases, online forums, bank accounts, and other assets. (*Id.* ¶ 67.) The same three individuals fabricated a story that Picciolini posted on social media about a rape victim he was working with. (*Id.*) LAH eventually forced Picciolini to disassociate with LAH. (*Id.* ¶ 70.)

In January 2018, LAH, Rangel, King, and McAleer attended an anti-hate conference in Portland. (*Id.* ¶ 114.) At the conference, Rangel told a group of people including former extremists counseled by Picciolini, anti-hate and anti-extremist professionals, and a journalist that Picciolini had caused LAH to lose a $400,000 grant because Picciolini had threatened the President of the United States. (*Id.* ¶¶ 115-16.) Rangel also told the group that Picciolini was a liar, that his memoir

was a lie, and that Rangel was going to "kick Picciolini's ass." (*Id.* ¶¶ 117, 120.) McAleer told the group that Picciolini stole anti-hate stories and narratives from him and passed them off as Picciolini's own and "stole 'Life After Hate' from him." (*Id.* ¶ 118-19.) Meeink told the group that Picciolini was a liar and had never performed an intervention before. (*Id.* ¶ 121.)

Picciolini created numerous works of authorship using his personal resources while he was associated with LAH. (*Id.* ¶ 50.) Five of those works are federally registered copyrighted works, with the following titles: Oak Creek Video, There is life after hate Video, the Formers Video (together, the "Picciolini Videos"), Life After Hate Website, and Life After Hate logo (together, the "Picciolini Copyrights").[1] (*Id.* ¶ 52.) LAH did not employ Picciolini to create the Picciolini Copyrights. (*Id.* ¶ 53.) Picciolini allowed LAH to use his copyrights while he was associated with LAH, but since his disassociation, LAH has not had authorization to use or publish the Picciolini Copyrights. (*Id.* ¶¶ 55-56.) LAH has continued to use and publish the Picciolini Copyrights, including the Picciolini Videos, since Picciolini's disassociation from LAH. (*Id.* ¶ 57.) The Picciolini Videos include Picciolini's likeness or voice. (*Id.* ¶ 58.) LAH is not authorized by Picciolini to use his likeness or voice to raise funds, conduct business, or for any other reason. (*Id.* ¶ 60.)

From 2009 to 2017, LAH's programs were funded primarily through donations from Picciolini and other donors. (*Id.* ¶ 62.) Picciolini was the sole catalyst driving LAH's donor support, and he facilitated significant donations and government grants. (*Id.*) Since Picciolini left LAH, several members of the public have contacted him and informed him that they donated to LAH based on confusion caused by LAH refusing to publicly disclose Picciolini's disassociation from LAH, and the donors' mistaken belief that Picciolini was still part of the organization. (*Id.* ¶ 72.)

---

[1] The Complaint includes the registration numbers for the Picciolini Videos and the Life After Hate Website. (Dkt. 35 ¶ 52.)

After renouncing his ties to extremism and in the course of founding and developing LAH, Picciolini became a well-known and internationally recognized subject-matter expert in peace advocacy and violent extremist intervention work. (*Id.* ¶ 18.) In 2008, Picciolini self-published a memoir about his experience disengaging from a hate group and becoming an anti-hate advocate. (*Id.* ¶ 16.) The memoir was republished by Hachette Books in 2017 under the title "White American Youth: My Descent into America's Most Violent Hate Movement—and How I Got Out." (*Id.*) Picciolini has contributed to and been featured in hundreds of national and international publications, has appeared in numerous media outlets, including network and cable broadcast news programs and radio, to discuss issues related to violent extremism and white-supremacist movements, and has been featured in his own documentary series on MSNBC called "Breaking Hate" and been profiled on CBS's "60 Minutes" and in publications like the Washington Post and New York Times. (*Id.* ¶¶ 18, 45-46.)

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the Court construes the complaint in the light most favorable to the plaintiff, accepts the factual allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That statement must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, a plaintiff's claim need only be plausible, not probable. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Evaluating whether a plaintiff's claim is sufficiently plausible to survive a motion to dismiss is "a

context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

**DISCUSSION**

LAH first argues that some of Picciolini and FRP's claims are preempted by the Copyright Act. They also argue that all claims otherwise fail to state a claim for relief under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## I. Copyright Act Preemption

Count I alleges that LAH infringed Picciolini's copyrights in violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501. (Dkt. 35 ¶¶ 73-79.) LAH argues that the Copyright Act claim preempts four other claims: unjust enrichment (Count IV), conversion (Count V), tortious interference (Count VI), and deceptive trade practices (Count X).

The Copyright Act preempts state law claims if two elements are met: (1) "the work in which the right is asserted must be fixed in tangible form and come within the subject matter of the copyright as specified in § 102," and (2) the rights in the state-law claims "must be equivalent to the exclusive rights under the Copyright Act." *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 500-01 (7th Cir. 2011) (citing 17 U.S.C. § 301a). "To avoid preemption, a state law must regulate conduct that is qualitatively distinguishable from that governed by federal copyright law—i.e., conduct other than reproduction, adaptation, publication, performance, and display." *Id.* at 501 (quoting *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2011)). A state-law right is equivalent even if it requires additional elements to make out a cause of action, if those "additional elements do not differ in kind from those necessary for copyright infringement." *Carter v.*

7

*Pallante*, 256 F. Supp. 2d 791, 803 (N.D. Ill. 2017) (quoting *Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 677 n.26 (7th Cir. 1986).

Picciolini and FRP do not dispute that the first element is met here. They argue, however, that the second element is not met as to each claim at issue because each claim "contain[s] at least one 'extra element' distinguishing [it] from a claim for copyright infringement." (Dkt. 107 at 3.) The Court will consider whether each state law claim subject to dismissal is based on a right equivalent to those under the Copyright Act.

### a.      Unjust Enrichment (Count IV)

Count IV alleges unjust enrichment. Picciolini and FRP allege that LAH received contributions from donors under the mistaken belief, fostered by LAH, that Picciolini was still associated with the organization. (Dkt. 35 ¶ 90.) Picciolini and FRP allege that LAH accomplished this by "concealing that Picciolini had disassociated from LAH" and using his likeness and his copyrights after he left LAH. (*Id.*) The unjust enrichment claim is clearly based, at least in part, on LAH's alleged use of the Picciolini Copyrights. To the extent the unjust enrichment claim relies on LAH's use of the Picciolini Copyrights, that conduct is not qualitatively different from the conduct proscribed by the Copyright Act and that part of the claim is preempted. The claim is also preempted to the extent it relies on LAH's use of Picciolini's "likeness," because the only facts Picciolini and FRP allege to support their claim that LAH used Picciolini's likeness involve LAH's alleged use of the Picciolini Copyrights. Picciolini and FRP argue that their unjust enrichment claim is not entirely preempted because it also relies on the allegation that LAH concealed the fact that Picciolini was no longer associated with the organization. Picciolini and FRP argue that this concealment is qualitatively different from conduct regulated by federal copyright law. The Court agrees, so this aspect of their unjust enrichment claim survives preemption. *See, e.g., Cambridge Grp.*

*Techs., Ltd. v. Motorola, Inc.*, No. 12 C 7945, 2013 WL 842650, at *4 (N.D. Ill. March 5, 2013) (collecting cases.)  But as discussed further below, the remaining claim does not survive LAH's challenge under Rules 12(b)(6) and 9(b).

### b.    Conversion (Count V)

Count V alleges conversion.  Picciolini and FRP claim that LAH converted the trademarks Life After Hate and Exit USA, the domain name ExitUSA.org, and the Picciolini Copyrights.  (Dkt. 35 ¶¶ 96-98.)  Picciolini and FRP concede, as they must, that their conversion claim as to the Picciolini Copyrights is preempted, because a claim for conversion of copyrighted materials involves conduct that is not qualitatively distinguishable from that governed by the Copyright Act. *See, e.g.*, *Seng-Tiong*, 648 F.3d at 501-02; Dkt. 107 at 6.  LAH does not argue that the remaining aspects of the conversion claim (*i.e.*, conversion of the trademarks and domain name) are preempted.  As discussed below, the remaining conversion claim is dismissed with prejudice.

### c.    Tortious Interference (Count VI)

Count VI alleges tortious interference with a business expectancy.  Picciolini and FRP allege that LAH interfered with business relationships through their "conversion, defamation, breach of fiduciary duty, and infringement."  (Dkt. 35 ¶¶ 102-03.)  As above, to the extent the tortious interference claim relies on LAH's alleged copyright infringement, that conduct is not qualitatively different from that governed by copyright law.  *See, e.g.*, *Carter*, 256 F. Supp. at 806.  Picciolini and FRP concede that that aspect of the claim is preempted.  (Dkt. 107 at 7.)  LAH does not argue that the remaining aspects of the tortious interference claim (*i.e.*, those based on the alleged conversion, defamation, and breach of fiduciary duty) are preempted.  As discussed below, the remaining tortious interference claim fails to state a claim for relief and is dismissed.

### d. Deceptive Trade Practices (Count X)

Count X alleges deceptive trade practices. Picciolini and FRP allege that LAH engaged in deceptive trade practices: (1) "by causing a likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification Picciolini [sic];" (2) "by representing that its services have sponsorship or approval by Picciolini, when they do not;" and (3) "by disparaging the services of Picciolini by false or misleading representations of fact." (Dkt. 35 ¶ 133.) As to point one, LAH argues that the only confusion or misunderstanding Picciolini and FRP allege involves the use of the Picciolini Copyrights, so that aspect of the claim is preempted. Picciolini and FRP do not respond to this argument and thus seem to concede that the likelihood-of-confusion aspect of their claim is preempted. Even if they did not make that concession, that part of the claim is preempted. Picciolini and FRP do not allege any facts other than LAH's use of the Picciolini Copyrights to support their claim that LAH caused a likelihood of confusion, and courts routinely find that deceptive trade practices claims based on alleged use of copyrighted materials are preempted by the Copyright Act. *See, e.g.*, *Defined Space, Inc. v. Lakeshore East, LLC*, 797 F. Supp. 2d 896, 902-03 (N.D. Ill. 2011) (collecting cases).

In response to LAH's motion, Picciolini and FRP point only to the second and third bases for their claim—*i.e.*, that LAH "falsely represented that Picciolini sponsored or approved of Defendants' services" and "disparaged Picciolini's services," and argue that that conduct is distinct from their copyright infringement allegations. (Dkt. 107 at 8.) As to the second basis for their claim, Picciolini and FRP similarly do not allege any facts, other than LAH's use of the Picciolini Copyrights, to support their claim that LAH represented that Picciolini approved or sponsored its services. The Complaint alleges elsewhere that LAH "refused to publicly disclose" that Picciolini left LAH, *see* Dkt. 35 ¶ 72, but the Complaint does not connect that refusal to the allegation that

LAH represented that Picciolini approved or sponsored its services. That inference is not reasonable without some further details or other facts to connect the dots, and none are alleged here. This aspect of their claim necessarily depends on LAH's use of the Picciolini Copyrights, so it is also preempted. That leaves just the third basis—that LAH disparaged Picciolini's services. As discussed further below, the remainder of the claim is dismissed under Rule 12(b)(6).

## II. Rules 12(b)(6) and 9(b)

### a. Copyright Infringement (Count I)

To establish copyright infringement, plaintiffs must show two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 760 (7th Cir. 2016). Here, Picciolini and FRP allege that Picciolini owns five federally registered copyrighted works, three of which are videos. They list the titles of the works and their registration numbers and allege that LAH has continued to "use and publish" his copyrights, including the videos, without his authorization. (Dkt. 35 ¶¶ 52, 56-57.) LAH argues that this fails to state a claim for copyright infringement because it does not contain enough detail about the manner of LAH's alleged copying—e.g., "where, when, or how" LAH used the copyrights. But copyright infringement claims are not "held to a particularity requirement akin to Federal Rule of Civil Procedure 9(b)," and LAH does not cite any binding caselaw holding otherwise. *See Mid America Title Co. v. Kirk*, 991 F.2d 417, 421-22 (7th Cir. 1993); *see also Hart v. Amazon.com, Inc.*, No. 15 C 1217, 2015 WL 8489973, at *4 (N.D. Ill. Dec. 8, 2015). Picciolini and FRP need only meet the pleading requirements in *Iqbal* and *Twombly*. By alleging that Picciolini owns valid copyrights and that LAH continues to "use and publish" them, they clear that bar, but just barely. Their allegations are sparse and they must provide much more detail about the circumstances of LAH's alleged use of the copyrights to survive summary

judgment. But at this stage, where the Court assumes the truth of their allegations, they have alleged enough to survive a Rule 12(b)(6) challenge.

### b. Right of Publicity (Count II)

Count II alleges a violation of the Illinois Right of Publicity Act, which provides that a person "may not use an individual's identity for commercial purposes . . . without having obtained previous written consent." 765 ILCS 1075/30(a). To allege a claim for appropriation of likeness under IPRA, a plaintiff must set forth the same three elements required for a common-law appropriation-of-likeness claim, which are: "(1) an appropriation of one's name or likeness; (2) without one's consent; and (3) for another's commercial benefit." *See Jordan v. Jewel Food Stores, Inc.*, 83 F. Supp. 3d 761, 767 (N.D. Ill. 2015) (citing *Blair v. Nev. Landing P'Ship*, 859 N.E.2d 1188, 1192 (Ill. App. Ct. 2006)).

Here, Picciolini alleges that his copyrighted videos "include [his] likeness or voice," that LAH "publishes [the videos] for commercial purposes," and that he has not authorized LAH to use his "likeness or voice to raise funds, conduct business, or for any other reason." (Dkt. 35 ¶¶ 58-60.) This is precisely the kind of "formulaic recitation of the elements of a cause of action" that is insufficient under Rule 8(a)(2). *See Iqbal*, 556 U.S. at 678. The fact that Picciolini and FRP identify the videos is not enough. The Complaint does not even specify what aspect of the videos the claims are based on. It alleges that the videos contain Picciolini's "likeness or voice." (Id. ¶ 58, 60.) Well, which is it? These allegations are not sufficient to put LAH on notice of Picciolini and FRP's claim. They recite the elements of the cause of action and provide no other detail whatsoever to show how Picciolini's likeness was appropriated. Count II is dismissed without prejudice. *See, e.g.*, *Martin v. Living Essentials, LLC*, 653 F. App'x 482, 486 (7th Cir. 2016)

(affirming dismissal of IPRA claim where allegations were too ambiguous to identify the attribute of the plaintiff's identity at issue).

### c. Unfair Competition – Lanham Act (Count III)

Count III alleges that LAH used Picciolini's name and reputation to misrepresent the nature of its services in violation of the Lanham Act, 15 U.S.C. § 1125. As an initial matter, the parties dispute whether a false representation claim under the Lanham Act requires a plaintiff to meet Rule 9(b)'s heightened pleading standard. LAH cites nonbinding case law holding that Rule 9(b) applies. Picciolini and FRP argue that their Lanham Act claim does not assert an "overt and fraudulent misrepresentation by LAH, but instead an implicit one," and so Rule 9(b) does not apply. (Dkt. 107 at 11 n.2.) Regardless, the Court need not determine whether Rule 9(b) applies to Picciolini and FRP's Lanham Act claim, because it fails to meet the less-stringent pleading requirement of Rule 8(a)(2).

"To establish a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999). Picciolini and FRP argue that they have established these elements by alleging that LAH continues to use Picciolini's copyrighted works, which "created the false impression that Picciolini was still associated with LAH" and amounts to LAH "using Picciolini's name and reputation" to

misrepresent the nature of LAH's services.  (Dkt. 107 at 10.)  They cite paragraphs 56 and 57 of the Complaint, which do allege that LAH continued to use Picciolini's copyrighted videos, but the Complaint says nothing about how those actions in turn created the false impression that Picciolini was still associated with LAH, or how LAH "used Picciolini's name and reputation."  Because Picciolini has alleged no details whatsoever about the videos, except that they contain either his likeness or his voice, the Court will not make the inference that LAH's alleged use of Picciolini's copyrighted videos created the impression that Picciolini was still associated with LAH.  There are no other facts alleged to establish that LAH made a "false statement" about its services.  Picciolini and FRP thus fail to establish the first element required for a Lanham Act claim, *see Hot Wax*, 191 F.3d at 819, and Count III is dismissed without prejudice.

### d.     Unjust Enrichment (Count IV)

In Count IV, Picciolini and FRP allege that LAH received contributions from donors under the mistaken belief that Picciolini was still associated with LAH, which LAH accomplished by "concealing that Picciolini had disassociated from LAH" and using his likeness and his copyrights after he left LAH.  (Dkt. 35 ¶ 90.)  As discussed above, the unjust enrichment claim is preempted to the extent it relies on LAH's use of Picciolini's copyrights and likeness.  All that remains of the claim is that LAH accepted contributions from donors who mistakenly believed Picciolini was still associated with LAH because LAH "concealed" that he had left.

If an unjust enrichment claim is based on allegations of fraud, those allegations must be pleaded with the heightened specificity required by Rule 9(b)—*i.e.*, the plaintiff must describe the "who, what, when, where, and how" of the fraud.  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441, 47-48 (7th Cir. 2011).  Picciolini and FRP argue that their claim is not based on fraud, and is thus not subject to Rule 9(b), because it relates not to

fraudulent conduct, but to "other unlawful acts, such as copyright infringement and unfair competition." (Dkt. 107 at 11.) But those aspects of their claim are preempted. Regardless, the Complaint makes clear that the unjust enrichment claim is based on fraud, because it alleges that "LAH's wrongful receipt and retention of such donations was accomplished through concealment, fraud, and conspiracy." (Dkt. 35 ¶ 92.) Rule 9(b) applies to the allegations underlying the unjust enrichment claim and they do not come close to meeting that heightened standard. The Complaint contains just two sentence fragments about the alleged concealment, stating that "LAH refus[ed] to publicly disclose Picciolini's disassociation from LAH" and that LAH fostered the belief that Picciolini was still associated with the organization "by concealing that Picciolini had disassociated from LAH." (*Id.* ¶¶ 72, 90.) That does not provide the requisite "who, what, when, where, and how" of the fraudulent conduct underlying the unjust enrichment claims. Count IV is dismissed without prejudice.

### e. Conversion (Count V)

Count V alleges conversion. Picciolini and FRP claim that LAH converted the trademarks Life After Hate and Exit USA, the domain name ExitUSA.org, and the Picciolini Copyrights. (Dkt. 35 ¶¶ 96-98.) As discussed above, the conversion claim as to the Picciolini copyrights is preempted. As for the trademarks, "the law is clear that there is no common law cause of action for conversion of trademark." *See, e.g.*, *Foodworks USA, Inc. v. Foodworks of Arlington Heights, LLC*, No. 10 CV 1020, 2014 WL 6661003, at *5 (N.D. Ill. Nov. 24, 2014) ("Indeed, as a leading treatise found, [e]very court to consider such a claim has rejected it.") (citing 4 *McCarthy on Trademarks and Unfair Competition* § 25:9.50 (4th ed.); *see also Am. Nat. Ins. Co. v. Citibank, N.A.*, 543 F.3d 907, 910 (7th Cir. 2008) ("Illinois courts do not recognize an action for conversion of intangible rights."). Finally, as to the domain name, the Court is similarly not aware of any case

under Illinois law recognizing a claim for conversion of digital property like a domain name, and neither party cites any. As another court in this district recently explained while dismissing a claim for conversion of digital files:

> [T]his Court has only "limited discretion to adopt untested legal theories brought under the rubric of state law." *Affiliated FM Ins. Co.*, 831 F.2d at 155. Moreover, "[w]here the state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). Here, a state appellate decision is on point and concludes that a digital file is insufficiently tangible property for a conversion claim to survive. Furthermore, although the needs of the digital age could prompt Illinois courts to revisit the scope of the conversion cause of action in the future, the Seventh Circuit and Illinois courts have given no indicia that the Illinois Supreme Court would in fact alter its stance at this time. iHeartMedia's conversion claim therefore fails.

*Sheridan v. iHeartMedia, Inc.*, 255 F. Supp. 3d 767, 781 (N.D. Ill. 2017) (citing *Ogbolumani v. Young*, No. 1-14-1930, 2015 WL 1284064, at *9 (Ill. App. Ct. March 20, 2015)) ("[T]here is no recognized cause of action in Illinois for a trespass to chattel claim based on trespass to an intangible such as digital information contained on a USB drive. Digital information such as plaintiff's data files on the USB drive is not tangible personal property and therefore is not chattel.") Because Illinois courts do not recognize conversion claims for trademarks or digital property like domain names, and the conversion claim based on copyright is preempted, Count V is dismissed with prejudice.

### f.    Tortious Interference With a Business Expectancy (Count VI)

Count VI alleges that LAH intentionally interfered with Picciolini and FRP's business relationships with "contacts, potential donors, and entities that make grants." (Dkt. 35 ¶ 101.) Picciolini and FRP allege that LAH interfered through "their conversion, defamation, breach of fiduciary duty, and infringement." (*Id.* ¶ 102.) The elements for a claim of intentional interference with a prospective economic advantage are: "(1) a reasonable expectancy of entering into a valid

business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 686 (7th Cir. 2014) (citation omitted). "Actions that form the basis of a tortious interference claim must be directed at third-party business prospects." *Id.* (citation omitted).

Here, Picciolini and FRP's claim fails because they do not allege how any of LAH's actions forming the basis of their claim were "directed at third-party business prospects," as they must. *See id.* There are no allegations whatsoever about how LAH interfered with Picciolini and FRP's "contacts" or "entities that make grants." As for "donors," while Picciolini and FRP do allege that LAH improperly accepted donations from individuals who mistakenly believed Picciolini was still affiliated with LAH, there are no allegations in the Complaint about how LAH affirmatively took steps to direct any actions toward the donors. Indeed, the crux of that claim is that LAH wrongfully accepted donations by "refusing to publicly disclose Picciolini's disassociation from LAH." (Dkt. 35 ¶ 72.) That is hardly the sort of "action . . . directed at third-party business prospects" that Picciolini and FRP must allege to state a claim for tortious interference. *See McCoy*, 760 F.3d at 686. Count VI is dismissed without prejudice.

### g. Conspiracy (Count VII)

Count VII alleges that LAH conspired to remove Picciolini from LAH's Board so that he could be terminated and LAH could then "take possession of the funds raised by Picciolini," and convert and use the Life After Hate and ExitUSA trademarks, the ExitUSA.org domain name, and the Picciolini Copyrights. (Dkt. 35 ¶ 106.) The conspiracy claim is based on other claims alleged here—conversion, breach of fiduciary duty, and unjust enrichment (to the extent the claim relies

on LAH's having "take[n] possession of the funds raised by Picciolini.") As discussed above, Picciolini and FRP fail to state claims for conversion and unjust enrichment. As discussed below, the same is true for breach of fiduciary duty. "Conspiracy is not an independent tort." *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000). "If a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails." *Id.* Because Picciolini and FRP failed to plead the underlying claims, their conspiracy claim is dismissed without prejudice. *See, e.g.*, *Galvin v. Ill. Republican Party*, 130 F. Supp. 3d 1187, 1197 (N.D. Ill. 2015).

**h.    Breach of Fiduciary Duty (Count VIII)**

Count VIII alleges that the four individual third-party defendants owed Picciolini a fiduciary duty and breached the duty by conspiring to remove him from the LAH Board and eventually firing him. (Dkt. 35 ¶¶ 110-11.) "Where a fiduciary relationship does not exist as a matter of law, a plaintiff must plead facts from which a fiduciary relationship arises." *Shannon v. O'Malley*, Nos. 1-17-1597 & 1-17-1942 (cons.), 2018 WL 6920089, at *8 (Ill. App. Ct. Dec. 31, 2018). Here, Picciolini alleges that the individuals owed him a fiduciary duty "as a Board member and officer of LAH," "as the owner of the Life After Hate and ExitUSA trademarks," and through the "use of his likeness and Picciolini Copyrights" after he left LAH. (Dkt. 35 ¶ 110.) In response to the motion to dismiss, Picciolini argues that those things afford him a fiduciary duty because the individual third-party defendants "sit in a position of trust vis-à-vis Picciolini." (Dkt. 107 at 17.)

The Court is not aware of any cases holding that corporate board members owe each other a fiduciary duty as a matter of law, and neither party has cited any. Nor has Picciolini cited any cases to support his contention that the individuals' use of his trademarks, likeness, or copyrights created a legal fiduciary duty. Instead, he argues that a fiduciary duty arose because he and the

individuals "s[at] in a position of trust." Setting aside that Picciolini and FRP have not pleaded

facts sufficient to establish that the parties "s[at] in a position of trust," trust is not enough. "The

essence of a fiduciary relationship is that one party is dominated by the other." *Pommier v. Peoples*

*Bank Marycrest,* 967 F.2d 1115, 1119 (7th Cir. 1992). "The fact that one party trusts the other is

insufficient. We trust most people with whom we choose to do business. The dominant party

must accept the responsibility, accept the trust of the other party before a court can find a fiduciary

relationship." *Joyce v. Morgan Stanley & Co.*, 538 F.3d 797, 802 (7th Cir. 2008). There are no

allegations in the Complaint establishing that either party dominated the other, or that a dominant

party accepted the responsibility or trust of the other party, which is required to show a fiduciary

relationship. Picciolini has not pleaded facts giving rise to a fiduciary duty, so Count VIII is dis-

missed without prejudice.

### i. Defamation (Count IX)

Count IX alleges that three individual defendants defamed Picciolini during an industry

conference. Specifically, Picciolini alleges that Rangel told a group of former extremists, anti-

hate and anti-extremist professionals, and a journalist that Picciolini had caused LAH to lose a

$400,000 grant because Picciolini had threatened the President of the United States, that Picciolini

was a liar, that his memoir was a lie, and that Rangel was going to "kick Picciolini's ass." (*Id.* ¶¶

115-17, 120.) McAleer told the same group that Picciolini stole anti-hate stories and narratives

from him and passed them off as Picciolini's own, and "stole 'Life After Hate' from him." (*Id.* ¶¶

118-19.) Meeink told the group that Picciolini was a liar and had never performed an intervention

before. (*Id.* ¶ 121.)

"To state a claim for defamation under Illinois law, a plaintiff must allege that 'the defend-

ant made a false statement about the plaintiff, that the defendant made an unprivileged publication

of that statement to a third party, and that [the] publication caused damages.'" *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831–32 (7th Cir. 2019) (quoting *Green v. Rogers*, 917 N.E.2d 450 (Ill. 2009)). "If a statement's 'defamatory character is obvious and apparent on its face,' it is considered defamation *per se*, with the law then presuming damages." *Id.* (quoting *Tuite v. Corbitt*, 866 N.E.2d 114 (Ill. 2006)). "Illinois recognizes five categories of statements that are considered defamatory per se, [one] of which [is] relevant here—statements . . . that 'prejudice a party, or impute lack of ability, in his or her trade.'" *Id.* (quoting *Van Horne v. Muller*, 705 N.E.2d 898 (Ill. 1998)). "In a defamation *per quod* action, damage to the plaintiff's reputation is not presumed [and] . . . the plaintiff must plead and prove special damages to recover." *Tuite*, 866 N.E.2d at 121.

LAH argues that Picciolini's defamation claim should be dismissed on five grounds: (1) that because Picciolini is a limited-purpose public figure, he must plead that the statements were made with actual malice and did not; (2) that the statements are subjective opinion, not verifiable statements of fact, and thus not actionable; (3) that the statements are "loose, figurative language" and thus not actionable; (4) that the statements can be innocently construed; and (5) that Picciolini failed to plead special damages as required for a claim of defamation *per quod*.

First, though Picciolini does not contest LAH's argument that he is a limited-purpose public figure, at least for purposes of this motion, the Court finds that the Complaint does not allege that he is. Simply being well-known or prominent within a certain field, or appearing on television frequently to discuss issues related to that field, does not make one a limited-purpose public figure for defamation purposes. "In determining whether an individual may qualify as a limited public figure, Illinois has adopted [a] three-part test . . . First, there must be a public controversy, which means an issue that is being debated publicly, the outcome of which impacts the general public or

some portion of it in an appreciable way. A matter of general public interest or concern is not sufficient. Second, the plaintiff must have undertaken some voluntary act seeking to influence the resolution of the issues involved. And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy." *Jacobson v. CBS Broad., Inc.*, 19 N.E.3d 1165, 1176–77 (Ill. App. Ct. 2014.) The allegations here do not establish that there was a publicly debated issue at the heart of the alleged defamation, let alone an issue that impacts the general public. The alleged statements were made to a small group of industry personnel about a single individual. Nothing in the Complaint suggests that Picciolini's truthfulness or his role regarding LAH's loss of a $400,000 grant was "an issue being debated publicly." Because the Complaint does not establish that Picciolini is a limited-purpose public figure, he was not required to plead that the statements were made with actual malice.

Second, LAH argues that the statements are "nonactionable, subjective, opinion as opposed to verifiable statements of fact." (Dkt. 93 at 13.) "Opinions that do not misstate facts are protected not only by Illinois law but also by the First Amendment, and that is so even when the opinions concern one of the five defamation *per se* categories under Illinois law." *Bd. of Forensic Document Examiners*, 922 F.3d at 832. "In determining whether a statement is one of opinion or one of fact, Illinois law—in keeping with Supreme Court precedent—draws no firm dividing line. Courts consider whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content. Context is key, as it matters not only what was said, but who said it, where it was said, and the broader setting of the challenged statements." *Id.* (citations and internal quotation marks omitted).

Here, given the context of where (at an industry conference) and to whom (other industry members) the statements were made, Picciolini has alleged at least some statements that were verifiable and had factual content. Rangel's alleged statement that Picciolini caused LAH to lose a $400,000 grant because he threatened the President has a precise, readily understood meaning, particularly among the group to whom it was said, and it is verifiable—*i.e.*, it is possible to know, as a matter of fact, who or what caused LAH to lose the grant. As is Rangel's alleged statement that Picciolini is a liar and that his memoir is a lie. Depending on the context, a standalone statement that Picciolini is a liar may not be actionable, but when tied to the context of his memoir, it becomes verifiable. It is possible to know whether or not the things in Picciolini's memoir are true. The same is true of Meeink's alleged statement that Picciolini is a liar and had never performed an intervention before. Though LAH argues that the definition of "intervention" would differ from person to person and there is not enough context to make the statement objectively verifiable, that is not the case given the audience for the alleged statements. LAH's argument may be right if the statements were made to members of the general public, but members of the anti-hate community attending an industry conference would know what Meeink meant by "intervention," and it is possible to verify whether Picciolini has ever performed one or not.

Some of the remaining statements, however, do constitute opinion because they are not precise, readily understandable, or verifiable and thus are not actionable. McAleer's alleged statement that Picciolini "stole anti-hate stories and narratives from him and passed them off as Picciolini's own" does not provide enough context to rise to the level of a fact. The statement does not specify *how* Picciolini passed them off as his own (*e.g.*, by repeating them publicly or publishing them in his memoir) or precisely what it means to "steal" a "story or narrative." Without that kind of specificity, it is impossible to verify whether or not the statement is true. The same goes for

McAleer's statement that Picciolini "stole 'Life After Hate' from him."  It's not clear from the context what exactly McAleer says Picciolini stole—he could be talking about an idea, a brand name, a website, an organization, or a group of people.  This sort of imprecise statement, without more, cannot be verified and so it is not actionable.

Third, LAH argues that Rangel's alleged statement that he was going to "kick Picciolini's ass" is "loose, figurative language that no reasonable person would believe presented facts," which is not actionable.  *Coghlan v. Beck*, 984 N.E.2d 132, 145 (Ill. App. Ct. 2013).  Picciolini fails to respond to this argument.  Regardless, in this context, Rangel's alleged statement of intent about the future is not a verifiable fact, and it is the sort of "exaggerated, figurative, and hyperbolic speech" that the First Amendment protects.  *See id.*

Fourth, LAH argues that Rangel's alleged statement that Picciolini caused LAH to lose a $400,000 grant because he threatened the President is not defamatory because it is subject to an innocent construction.  According to LAH, the statement could be interpreted to mean that Picci-olini had threatened the President's politics, not his person, and so the statement could be construed to reflect positively on Picciolini, depending on the listener's politics.  "A statement which falls into a category supporting a claim for defamation *per se* will not be found to be defamatory if it is reasonably capable of an innocent construction."  *Knafel v. Chicago Sun-Times, Inc.*, 413 F.3d 637, 640 (7th Cir. 2005) (citation omitted).  "Courts must consider statements in context, giving the words, and their implications, their natural and obvious meaning."  *Id.* (citation omitted).  "If the complained-of statement may reasonably be innocently interpreted, it cannot be actionable *per se*."  *Id.* (citation omitted).  "Illinois courts emphasize that the interpretation must be reasonable."  *Id.*  Whether a statement is reasonably capable of an innocent construction is a question of law for the court to decide.  *Id.*

Here, Picciolini alleges that Rangel said that "Picciolini had caused LAH to lose a $400,000 grant because Picciolini had threatened President Donald Trump." (Dkt. 35 ¶ 116.) The natural and obvious meaning of "threatened President Donald Trump" is a threat to the President himself, not to his politics, his policies, or his administration. LAH's proposed innocent construction requires the listener to hear what he wants to hear and requires a leap beyond the natural and obvious meaning of the alleged words and their implications. That is not the sort of "reasonable" interpretation the First Amendment protects. *See Knafel*, 413 F.3d at 640.

Count IX is dismissed without prejudice only as to third-party defendant McAleer, as his alleged statements are nonactionable opinions. The motion to dismiss is denied as to the remaining claims in Count IX.

### j.    Deceptive Trade Practices (Count X)

Count X alleges that LAH engaged in deceptive business practices by causing a likelihood of confusion as to affiliation or association with Picciolini, by representing that its services were sponsored or approved by Picciolini, and by disparaging Picciolini's services. (Dkt. 35 ¶ 133.) As explained above, the claim is preempted by the Copyright Act except to the extent it is based LAH's alleged disparagement of Picciolini's services. A plaintiff bringing a claim under the Illinois Uniform Deceptive Trade Practices Act "must demonstrate that 'the circumstances that relate to the disputed [conduct] occur[red] primarily and substantially in Illinois.'" *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 809 F. Supp. 2d 857, 860 (N.D. Ill. 2011) (quoting *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 854 (Ill. 2005)). To determine whether the alleged conduct occurred "primarily and substantially in Illinois," courts can consider the following factors: "(i) [the] plaintiff's residence, (ii) where the deception occurred, (iii) where the damage to plaintiff occurred, and (iv) whether plaintiff communicated with defendants or its agents in Illinois"). *Id.*

(citation omitted). "If a plaintiff cannot make this showing because events were centered outside Illinois, then [he] must rely on some other state's law." *Id.* (citation and internal quotation marks omitted).

Here, all of the deception alleged in the Complaint (*i.e.*, the disparaging remarks) took place in Portland, Oregon. (*Id.* ¶¶ 114-121; *see also* Dkt. 107 at 20.) Picciolini points to the facts that he is an Illinois resident and was damaged here, which he argues tips the scales in his favor. (Dkt. 107 at 20.) The Court disagrees. Picciolini does not allege any facts about how the remarks damaged him in Illinois specifically, nor, for that matter, does he make any non-conclusory allegations about how the remarks damaged him at all. He merely alleges that he "has been damaged by such deceptive trade practices," and there are no factual allegations to demonstrate where or how he was damaged. The Court is thus unable to find that the alleged conduct occurred "primarily and substantially in Illinois," which Picciolini must allege to state a claim. Count X is therefore dismissed without prejudice.

## CONCLUSION

For the reasons stated here, the motion to dismiss [Dkt. 92] is granted in part and denied in part. Counts Two, Three, Four, Six, Seven, Eight, and Ten are dismissed without prejudice. Count Five is dismissed with prejudice. Count Nine is dismissed without prejudice as to third-party defendant McAleer only. The motion is denied as to Count One and the remainder of Count Nine.

Hon. Virginia M. Kendall
United States District Judge

Date: June 27, 2019

25