**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LIFE AFTER HATE, INC., a/k/a EXIT USA, | ) | |
| | ) | |
| *Plaintiff/Counter-Defendant*, | ) | |
| v. | ) | No. 18 C 6967 |
| | ) | |
| FREE RADICALS PROJECT, INC., and | ) | Judge Virginia M. Kendall |
| CHRISTIAN PICCIOLINI, | ) | |
| | ) | |
| *Defendants/Counter-Plaintiffs*. | ) | |
| | ) | |
| CHRISTIAN PICCIOLINI, | ) | |
| | ) | |
| *Third-Party Plaintiff*, | ) | |
| v. | ) | |
| | ) | |
| TONY MCALEER, SAMMY RANGEL, | ) | |
| ANGELA KING and FRANK MEEINK, | ) | |
| | ) | |
| *Third-Party Defendants*. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

At a time when people—particularly young people—are being radicalized online with alarming frequency,[1] nonprofit organizations like Life After Hate and Free Radicals Project provide critical outreach services to help individuals disengage from violence-based extremism. Unfortunately, these two organizations now find themselves in an ugly trademark dispute that can only distract them from the important work they perform.

Life After Hate brought this suit against Christian Picciolini and Free Radicals Project alleging trademark infringement and cybersquatting in violation of the Lanham Act, 15 U.S.C. §

---

[1] *See, e.g.*, Mark Berman, *Prosecutors say Dylann Roof 'self-radicalized' online, wrote another manifesto in jail*, WASHINGTON POST, Aug. 22, 2016, https://www.washingtonpost.com/news/post-nation/wp/2016/08/22/prosecutors-say-accused-charleston-church-gunman-self-radicalized-online/

1051 *et seq.*, as well as violations of Illinois and common law.  (Dkt. 1, 23.)  Picciolini and Free Radicals Project answered, asserted affirmative defenses, counterclaimed against Life After Hate, and brought third-party claims against four individuals associated with Life After Hate.  (Dkt. 35.) The Court dismissed some of Picciolini and Free Radicals Project's claims, and Picciolini and Free Radicals Project recently filed amended counterclaims and third-party claims.  (Dkt. 121, 128.) Now before the Court is Life After Hate's motion for a preliminary injunction.  (Dkt. 7.)  The parties conducted discovery, submitted briefs (Dkt. 8, 62, 71), participated in a 3-day preliminary injunction hearing (Dkt. 88, 89, 90), submitted post-hearing briefs (Dkt. 104, 105), and participated in oral argument (Dkt. 110).

Having considered all these materials, and for the reasons stated here, Life After Hate's motion for a preliminary injunction [Dkt. 7] is granted.  This opinion constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(2).

**STATEMENT OF FACTS[2]**

## I.      The Parties

Plaintiff Life After Hate, Inc. ("LAH") is an Illinois nonprofit based in Chicago that follows the model of "exit" programs developed in Europe in the 1990's to help individuals exit hate groups through education, interventions, academic research, and outreach.  (Dkt. 23 ¶ 7.) LAH provides direct "deradicalization" and "disengagement" services.  (Preliminary Injunction Hearing Transcript ("Hr'g Tr.") at 393:5-6.)  LAH also consults with communities, governmental organizations, NGOs, universities, and researchers.  (*Id.* 38:22-39:3.)  LAH has been featured in

---

[2] Also pending before the Court are LAH's motion to admit certain exhibits into evidence [Dkt. 100] and Defendants' motion to strike portions of Angela King's deposition testimony and certain exhibits [Dkt. 112].  Those motions are both granted in part and denied in part.  To the extent King's deposition testimony and the exhibits at issue in the two motions were admissible and relevant to the preliminary injunction, they have been included in the statement of facts and considered as part of the preliminary injunction analysis.  To the extent the testimony and exhibits were either not admissible or not relevant, they have been omitted and have not been considered.  Any further disputes as to the relevance or admissibility of evidence will be addressed as they arise in future proceedings.

many national media outlets and platforms, including CNN, NBC, CNBC, ABC, PBS, Chicago-, west coast-, and New York-based newspapers, *The Huffington Post*, documentaries, podcasts, and radio interviews.  (*Id.* 39:14-23; Angela King Deposition Transcript ("King Tr.") at 97:4-9.)  LAH has various social media accounts, including Facebook, YouTube and Twitter, which it uses to engage in discussion with individuals.  (Hr'g Tr. 33:25-33:9, 71:5-9, 92:5-10.)

Defendant Christian Picciolini is a former white supremacist and former member of a self-described "skinhead group."  (*Id.* 283:13-22, 284:3-14.)  Picciolini was recruited to join a white-supremacist gang in Chicago when he was 14-years-old and remained in the group for eight years. (*Id.*)  When he was 22, he managed to break away from the group and he has since dedicated his efforts to helping others leave violent extremist groups.  (*Id.* 283:23-287:18.)  Picciolini helped found LAH in 2009 and left the organization in 2017.  In 2018, Picciolini founded Free Radicals Project, Inc., which is also a Defendant in this action.  Free Radicals Project is a peace advocacy consulting group, where Picciolini works as a peace advocacy consultant and extremist interventionist.  (Dkt. 35 ¶ 11.)  Picciolini has helped over 300 people disengage from various extremist groups.  (Hr'g Tr. 285:16-17.)

## II.     The History of Life After Hate and ExitUSA

In 2009, Picciolini and Arno Michaelis, another former white supremacist and longtime friend of Picciolini's, started an online journal at the domain www.LifeAfterHate.org to discuss social issues and tell their stories about leaving extremist hate groups.  (*Id.* 26:23-27:13, 36:20-37:8, 175:16-176:6; 293:18-294:4.)  At that time, Michaelis had also written a book about his life that he later self-published titled "My Life After Hate."  (*Id.* 158:22-23; 186:2-5, 290:16-24.) Other individuals contributed literary content to the online journal, but Michaelis was the leader

of the project. (*Id.* 33:24-34:23, 175:18-176:6, 489:11-16.) The online journal went live at the domain www.LifeAfterHate.org on January 15, 2010. (*Id.* 174:17-21; 480:2-6.)

In February 2010, Michaelis and two others, Robert T. Hasselkus and Jeff Pearcy, formed a Wisconsin nonstock corporation called Life After Hate, Inc. (the "Wisconsin Corporation"). (*Id.* 179:25-180:15.) Michaelis, Hasselkus, and Pearcy are listed as the Wisconsin Corporation's directors on the articles of incorporation. (*Id.*; *see also* LAH Ex. 14, Dkt. 115-3 at 23-26.) The Wisconsin Corporation operated the online journal under the name "Life After Hate." (Hr'g Tr. 107:12-24.) Around this time, Picciolini also began providing "exit," "intervention," and "disengagement" services through the Wisconsin Corporation under the name "Life After Hate." (*Id.* 293:7-294:8.) In June 2010, Michaelis met Sammy Rangel, a former member of the Maniac Latin Disciples who left the gang and became a counselor and mental health professional. (*Id.* 23:16-21, 25:1-9, 22-25.) Rangel introduced Michaelis to his contacts at local schools and the two began speaking to students about their experiences. (*Id.* 27:14-28:10.) They named their school-based speaking program "Kindness, Not Weakness" and operated it as part of the Wisconsin Corporation. (*Id.*)

In the summer of 2011, Picciolini, Michaelis, and Rangel attended a conference in Dublin, Ireland called The Summit Against Violent Extremism. (*Id.* 30:22-23, 31:15-16.) The purpose of the conference was to bring together former members of extremist hate groups (known as "formers" in industry parlance), victims of extremist attacks, and other interested parties to brainstorm ways to counter violent extremism. (*Id.* 31:2-9.) At the conference, Picciolini, Michaelis, and Rangel met with other formers—namely Tony McAleer, Frank Meeink, and Angela King—and the group decided to start a nonprofit organization to provide support and guidance to individuals looking to leave extremist groups. (*Id.* 28:24-29:12, 31:11-16; *see also* King Tr. 11:2-

12:14.)  The group decided to call the nonprofit organization "Life After Hate."  (Hr'g Tr. 29:10-12.)

Shortly after returning home from the Dublin conference, the group formed an Illinois nonprofit called "Life After Hate," which is the plaintiff in this action ("LAH").  (*Id.* 31:18-32:11.) Picciolini, McAleer, Meeink, and Mike Abramson are listed as the "initial 4 (four) Board of Directors" on LAH's Articles of Incorporation.  (LAH Ex. 15.)  The Wisconsin Corporation's assets—including its members and volunteers, the www.LifeAfterHate.org website, and the "Kindness, Not Weakness" program—became a part of the new Illinois nonprofit LAH.  (Hr'g Tr. 29:24-30:15, 116:25-117:17, 120:16-20.)

In November 2012, Michaelis left LAH.  After Michaelis left, Picciolini informed Michaelis that "the assets of LAH and KNW belong to the organization," including "the Youtube and your arno@lifeafterhate.org email address."  (LAH Ex. 1.)  Picciolini told Michaelis "[w]e'll need the youtube account back, as well as the KNW twitter credentials."  (*Id.*)  Picciolini reiterated that LAH needed the YouTube account because "the domain is the organization's and belongs to us," and Michaelis keeping the account for himself "will be confusing."  (*Id.*)  Picciolini asked Michaelis to turn over access to "all LAH and KNW associated domains" to Picciolini's GoDaddy account.  (*Id.*)

In February 2014, McAleer traveled to Europe to meet with a group called "Exit Sweden" and attend a conference where other anti-extremism "Exit"-branded groups would be present. (Hr'g Tr. 356:21-357:2.)  "Exit"-branded organizations, including Exit Sweden, Exit Germany, Exit Norway, Exit U.K., and Exit Slovakia, provide similar disengagement and deradicalization services in their respective countries.  (*Id.* 305:3-306:4, 393:2-16; 435:6-23.)  During the trip, McAleer learned that anti-extremist groups in Europe were not familiar with LAH or its work, but

that similar European organizations with "Exit"-branding were getting "instant recognition" in the industry. (*Id.* 393:2-19.) McAleer decided that LAH should start calling itself "ExitUSA" to more accurately convey the outreach services it was offering and improve its recognition among peer organizations in Europe. (*Id.* 357:3-14; 393:2-19.) Other members of LAH agreed, and the group filed paperwork soon after to start doing business as "ExitUSA." (*Id.* 357:15-358:2.) In May 2014, LAH submitted a grant proposal to the Research Triangle Institute which specifically referenced both "Life After Hate" and "ExitUSA." (*Id.*) "ExitUSA" became a "program" of LAH. (*Id.* 207:6-16.)

In late 2014, a Chicago-based consulting and creative agency, Gravitytank, selected LAH to receive *pro bono* advertising and branding services. (*Id.* 208:13-209:11; 360:3-22.) Gravitytank and LAH worked together to create a logo for ExitUSA, a new logo for LAH, and the tagline "No Judgment. Just Help." (*Id.*; 360:25-361:16.) The logos were based on previous designs that Picciolini had created. (*Id.* 210:4-18, 212:19-213:2.)

In January 2015, Picciolini conducted research and identified the owner of the domain www.ExitUSA.org, an individual named Richard Cote. (*Id.* 191:4-192:4; LAH Ex. 24.) Picciolini contacted Cote and asked him to sell the domain, and Picciolini eventually negotiated a $500 purchase price and purchased the domain. (*Id.*, 196:4-10.) Picciolini testified that he paid $500 for the domain with his personal funds and was later reimbursed by LAH. (*Id.* 193:4-6, 196:23-197:8.) Counsel for LAH showed Picciolini a Chase Bank withdrawal slip from LAH's bank account dated February 23, 2015 in the amount of $500. (*Id.* 198:24-199:25, LAH Ex. 2.) The customer name is listed as "Life After Hate." (*Id.*) The slip also reads, "If Purchasing a Cashier's Check Please Provide Payee Name," and the name "Richard N. Cote" is written just below that line. (*Id.*) Picciolini testified that the withdrawal slip was not a receipt for a cashier's check to

Cote and was instead a receipt for the $500 withdrawal LAH made to reimburse Picciolini for purchasing the domain, and that Picciolini wrote Cote's name on the withdrawal slip to reference what the payment was for. (Hr'g Tr. 199:8-25.) The domain was eventually transferred to LAH's GoDaddy account, which lists Picciolini as the administrator. (*Id.* 359:11-14.) LAH began using the ExitUSA.org domain. (*Id.* 372:7-9.) Picciolini also created an "ExitUSA" YouTube channel. (*Id.* 420:6-15.)

Later in 2015, McAleer submitted a proposal on LAH's behalf to the Institute for Strategic Dialogue ("ISD"), a London-based think-tank. ISD was soliciting organizations to apply for funding to create "counter-narrative campaign" videos to be used to target individuals online who were leaning toward violent extremism. (*Id.* 416:9-25.) LAH was one of three organizations chosen by ISD to receive funding to create and promote the videos. (*Id.* 364:7-18.) Picciolini led the effort to create the videos, since he had previous experience on television and was the most "tech savvy." (*Id.* 364:19-22.) Angela King offered input on the video scripts and kept track of production expenses. (King Tr. 60:2-11, 64:20-65:2.) Four videos were created as part of the campaign, titled "No Judgment. Just Help.," "There is Life After Hate," "Oak Creek," and "The Formers." (Hr'g Tr. 418:8-18.) The videos were uploaded to ExitUSA's YouTube channel. (*Id.* 71:10-22, 420:13-22.)

## III. Picciolini's Termination and Free Radicals Project

Picciolini held many different titles and positions at LAH from 2011 to 2017, including Executive Director, Executive Board Chair, Program Director of ExitUSA, and Board member. (*Id.* 279:20-280:17.) Beginning in 2016, Picciolini and his LAH colleagues engaged in a series of escalating disagreements and conflicts, which are largely irrelevant to LAH's preliminary injunction motion. In November 2016, Picciolini proposed to McAleer and King that LAH "spin

off" ExitUSA to be run as a separate nonprofit led by Picciolini. (*Id.* 216:8-20; LAH Ex. 7.) LAH's Board members rejected Picciolini's proposal. (*Id.*) In April 2017, Picciolini resigned from LAH's Board and was named Program Director of ExitUSA and was tasked with running the ExitUSA program. (*Id.* 49:7-50:10.)

On August 23, 2017, LAH's Board terminated Picciolini from LAH. (*Id.* 60:5-17.) After learning that he was being terminated, Picciolini again proposed that LAH "spin off" ExitUSA to him to be run as a separate entity as a way to "make it seem like an amiable split" and to avoid "confus[ing] people and rais[ing] questions." (LAH Ex. 8., Dkt. 115-3 at 14.) Picciolini also suggested that LAH give him $50,000 "in seed money for ExitUSA" and the title Chairman Emeritus of LAH ("an honorary title, no power or voting"), and that LAH release a public statement that Picciolini's departure was "a strategic decision on both of our parts, so that each business could focus on what they do best in a way that doesn't dilute or compromise the other." (*Id.*) LAH declined Picciolini's proposal, in part because ExitUSA was such a "significant part" of LAH and was "associated with [LAH's] identity." (Hr'g Tr. 66:4-12.)

Shortly after Picciolini's termination, LAH's members learned that they could not control or access the ExitUSA.org domain. (*Id.* 69:8-23.) Soon after that, they learned that the ExitUSA.org domain was automatically redirecting users to a different webpage—ChristianPicciolini.com/ExitUSA, which featured ExitUSA logos and slogans, along with Picciolini's photo and posts about his books. (*Id.* 69:24-70:23.) Picciolini was responsible for redirecting the ExitUSA.org domain to his personal website. (*Id.* 245:6-8.) Around this time, LAH also learned that it could not access the Twitter account @ExitUSATeam, which it had been previously using, nor could it access the ExitUSA Youtube channel, which was "attached to

[Picciolini's] email."  (*Id.* 372:1-24.)  Around the same time, Picciolini registered the domain "Exit.us."  (*Id.* 245:9-11.)

In September 2017, McAleer was attending an industry conference and spoke to Brette Steele, who worked in the Community Partnerships unit of the United States Department of Homeland Security and was part of a DHS team that evaluated a grant application by LAH.  (*Id.* 382:5-16, 383:2-8.)  Steele asked McAleer "what was happening with Life After Hate."  (*Id.*)  Erin Wilson, who also worked on countering violent extremism for DHS, asked McAleer "what was happening with . . . [Exit]USA."  (*Id.* 383:9-384:2.)

In January 2018, Picciolini started an Illinois nonprofit called Free Radicals Project.  (*Id.* 264:7-11.)  Free Radicals Project has a website and social media accounts on Facebook and Twitter.  (*Id.* 263:10-21.)  At some point in time, the Free Radicals Project website featured the phrases "No Judgment. Just Help." and "Free Radicals: There is life after hate."  (*Id.* 272:15-273:14, LAH Ex. 39.)  The four videos created as part of LAH's grant from ISD and posted on the ExitUSA YouTube channel were also posted on the Free Radicals Project website at some point in time.  (*Id.* 425:9-17.)  Free Radicals Project offers services similar to those offered by LAH.  (*Id.* 77:3-78:8.)  Picciolini began promoting Free Radicals Project in podcast interviews and on Facebook.  (*Id.* 266:18-269:4; LAH Ex. 39.)

At some point in 2018, the domain ExitUSA.org began automatically redirecting users to a website for Free Radicals Project.  (*Id.* 79:5-12.)  As a result of the redirection, LAH lost the ability for individuals to contact them through the ExitUSA.org website and lost web traffic.  (*Id.* 401:14-402:1.)  Around the same time, the description of the @ExitUSATeam Twitter handle was changed to "ExitUSA (now @FreeRadicalsOrg)," inviting users to visit the @FreeRadicalsOrg Twitter page.  (*Id.* 80:7-14, 403:8-14, LAH Ex. 58.)  After that, a member of one of LAH's support

groups asked Rangel "what was happening with ExitUSA," whether LAH was keeping ExitUSA or giving it away, whether there were two ExitUSA programs, whether ExitUSA "belonged to" LAH or to Free Radicals Project, and whether LAH was still working with Picciolini. (*Id.* 83:1-25.) In August 2018, a journalist named Keiko Kawabe emailed Rangel and asked if LAH controlled ExitUSA or if Picciolini did, or if LAH and Picciolini controlled it as partners. (*Id.* 84:11-14, 87:17-90:4.)

LAH suffered reputational harm as a result of Picciolini and Free Radicals Project's use of the marks and the ensuing confusion, particularly because LAH relies on establishing trust, credibility, and integrity with the individuals it tries to assist. (*Id.* 90:23-93:17.)

## IV. LAH's Enforcement Efforts and Post-Suit Developments

After LAH discovered that it no longer had control over the ExitUSA.org domain, it retained legal counsel. (*Id.* 375:15-18.) On September 20, 2017, LAH filed applications for "EXITUSA" and "LIFE AFTER HATE" with the U.S. Patent and Trademark Office ("USPTO"), with Floyd A. Mandell listed as LAH's attorney of record. (EXITUSA, Registration No. 87615677; LIFE AFTER HATE, Registration No. 87615450.) On November 13, 2017, LAH's attorney, James Sipchen, sent Picciolini's attorney a cease-and-desist letter, which asserted that LAH owned the "ExitUSA" and "Life After Hate" marks and demanded that Picciolini stop using them. (Hr'g Tr. 376:12-377:16, LAH Ex. 38.) The letter also stated that LAH applied for registration of "Life After Hate" and "ExitUSA" with the USPTO. (LAH Ex. 38.) The same day, November 13, 2017, Picciolini filed a trademark application for "EXITUSA" with the USPTO. (*Id.* 245:14-17; LAH Ex. 10.) Picciolini's application was eventually abandoned. (LAH Ex. 10.)

Picciolini's attorney responded to the cease-and-desist letter and disagreed with LAH's characterization of the ownership of the marks and the alleged infringement, and suggested that

the parties "discuss the division of assets." (Hr'g Tr. 377:17-23; Def. Ex. 9, Dkt. 115-2 at 9.) LAH did not think it made sense to do so. (*Id.*) From December 2017 through the spring of 2018, LAH's officers tried to reclaim the ExitUSA.org domain through GoDaddy and Google. (*Id.* 375:24-376:2.) On May 29, 2018, LAH registered the EXITUSA and LIFE AFTER HATE marks on the USPTO's Principal Register. (EXITUSA, Registration No. 87615677; LIFE AFTER HATE, Registration No. 87615450; *see also* LAH Exs. 35-36.)

At some point after the marks were registered, LAH applied to an organization that connects non-profit groups with law firms providing *pro bono* legal assistance. (Hr'g Tr. 380:7-14.) After waiting five to six weeks for a response, LAH learned that it was not selected to receive *pro bono* services. (*Id.*) By this time, it was summer and LAH contacted its previous counsel, Floyd Mandel, who told LAH that it could not afford his firm's fees. (*Id.* 380:14-381:7.) Mandel referred LAH to its current counsel, Saper Law Offices, LLC. (*Id.*) LAH first contacted Saper Law Offices in August 2018 and retained the firm in September 2018, and this lawsuit was filed on October 17, 2018. (*Id.*, *see also* Dkt. 1.)

According to LAH's post-hearing filings, Picciolini and Free Radicals Project ceased much of the complained-of conduct after this litigation commenced: sometime around November 2018, the ExitUSA.org domain stopped redirecting to Picciolini's website; in January 2019, Picciolini stopped using the @ExitUSATeam Twitter account; and in February 2019, the ExitUSA YouTube channel was disabled. (*See* Dkt. 105-1 ¶ 122.) That said, LAH maintains that Picciolini and Free Radicals Project are still using the "No Judgment. Just Help." and "Life After Hate" phrases on the Free Radicals Project website and posting links to the four videos LAH produced as part of the ISD grant award.

# DISCUSSION

As the party seeking a preliminary injunction, LAH must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If LAH cannot establish each of these prerequisites, the "inquiry is over and the injunction must be denied." *Abbott*, 971 F.3d at 11. If the Court concludes that LAH met those prerequisites, "then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Ty*, 237 F.3d at 895. The Court must also consider the public's interest. *Id.*

## I.      Likelihood of success on the merits

To prevail on its trademark infringement claims, LAH must establish that 1) it owns validly registered, protectable marks and 2) Defendants' use of the marks is likely to cause confusion among consumers. *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 419 (7th Cir. 2019); *see also SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 595 (7th Cir. 2019). At the preliminary injunction stage, LAH must demonstrate that it has a "better than negligible" change of succeeding on the merits. *Ty*, 237 F.3d at 897.

### a.      Validity of the marks

To determine whether Defendants violated the Lanham Act, the Court must first determine whether "LIFE AFTER HATE," "EXITUSA," and "No Judgment. Just Help." are valid, protectable trademarks. "Trademark law awards trademark protection to various categories of words, terms, and phrases if consumers rely on those marks to identify and distinguish one company's goods or services from those of others." *SportFuel*, 932 F.3d at 598. "The law

recognizes five categories of trademarks, in ascending order of distinctiveness: generic, descriptive, suggestive, arbitrary, and fanciful." *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976) (Friendly, J.)).

"Generally, trademark law does not allow sellers to register marks for terms that are generic or descriptive of products or services." *SportFuel*, 932 F.3d at 598. "Conversely, the law affords automatic protection to suggestive, arbitrary, and fanciful terms, which are inherently distinctive." *Id.* at 599. Once a mark is registered, "one of two" presumptions applies: (1) that the registered trademark is at least suggestive and is not merely descriptive or generic; or (2) that if descriptive, the mark is accorded secondary meaning." *Uncommon*, 926 F.3d at 420; *Packman*, 267 F.3d at 638; *see also* 15 U.S.C. § 1115 (registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark").

LAH relies on this presumption and asserts that two of its marks, LIFE AFTER HATE and EXITUSA, are valid because they are registered, and it is thus presumed that the marks are at least suggestive and not merely descriptive or generic. "But the presumption is just that—a presumption, open to rebuttal," and Defendants can overcome the presumption by presenting evidence that the marks are merely generic or descriptive. *Uncommon*, 926 F.3d at 421; *see also* *Packman*, 267 F.3d at 638.

Defendants attempt to do so, and first point to McAleer's testimony on cross-examination about the meaning of "Life After Hate." (*See* Dkt. 104 at 8-9.) McAleer agreed that the extremist groups LAH helps people disentangle from are referred to as "hate groups," and that "part of the services [LAH] offers is to help [people] with their life after leaving those hate groups." (Hr'g Tr.

13

450:25-451:12.)   According to Defendants, this testimony alone shows that "Life After Hate" merely describes LAH's services: namely, helping people with their life after leaving a hate group. This argument misses the mark.

"A mark is descriptive when it describes the product category to which the brand belongs." *Uncommon*, 926 F.3d at 420 (citation omitted).   "The mark need not describe the product completely, but it must depict an important characteristic of the product."   *Id.* at 421 (citation omitted).   "A suggestive mark, on the other hand, 'does not directly and immediately describe' an 'aspect of the goods.'"   *Id.* (quoting 6 McCarthy on Trademarks & Unfair Competition § 11:62 (5th ed. 2019) ("McCarthy on Trademarks").   "Instead, a suggestive mark 'requires the observer or listener to use imagination and perception to determine the nature of the goods.'"   *Id.* (citing *G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 996 (7th Cir. 1989)).

Though "[t]he line between descriptiveness and suggestiveness can be difficult to draw," *id.*, courts employ a few tests.   First, courts look to "how, and how often, the relevant market uses the word in question."   *Id.* (citing *Bliss Salon Day Spa v. Bliss World LLC*, 268 F.3d 494, 497 (7th Cir. 2001)).   Here, the record shows that only three players used the "Life After Hate" mark in the relevant market—LAH, Picciolini/Free Radicals Project, and Arno Michaelis.   There is no evidence in the record of how many other similar organizations are operating in the United States, but even so, the fact that "Life After Hate" is used so infrequently in this market indicates that the mark is suggestive, not just descriptive.   *Cf. Uncommon*, 926 F.3d at 421-22 (at least ten competitors using the word "capsule" in the name of their cell phone cases indicates that the mark is descriptive); *SportFuel*, 932 F.3d at 599 ("numerous examples of widespread industry use" of "Sports Fuel" indicates that the term is descriptive); *Bliss Salon Day Spa v. Bliss World LLC*, 268 F.3d 494, 497 (7th Cir. 2001) (the fact that "many" players in the beauty-care market use "BLISS"

in association with their products and services meant that the mark was functionally descriptive).

Courts also use a second, more common test: "the so-called degree-of-imagination test." *Uncommon*, 926 F.3d at 422. "[I]f a mark imparts information directly it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998). Understanding exactly what services "Life After Hate" provides requires a leap of imagination. Though Defendants argue that the term merely describes an aspect of LAH's services (*i.e.*, helping people with their lives after leaving hate groups), that concept is not readily apparent from the name (perhaps it would be if the mark were "Life After Hate Groups"). Nor is that the only service LAH provides. "Life After Hate" does not directly convey any particular idea, and a consumer would need to use their imagination to determine the nature of services provided by an organization called Life After Hate. This also indicates that the mark is suggestive. *See also, e.g.*, *Kastanis v. Eggstacy LLC*, 752 F. Supp. 2d 842, 849-50 (N.D. Ill. 2010) ("yolk" was suggestive and not merely descriptive of a restaurant that serves egg dishes).

Applying the same tests to EXITUSA is a closer call, but Defendants again fail to present enough evidence to overcome the presumption that EXITUSA is suggestive. Defendants point to McAleer and Picciolini's testimony about other "Exit"-branded organizations that provide similar disengagement and deradicalization services internationally: there are groups called Exit Sweden, Exit Germany, Exit Norway, Exit U.K., and Exit Slovakia. Defendants further contend that "USA" is merely a geographic designation and that "exit" is merely a type of group. Though the term "exit" is clearly used more often in this context and in this market than LAH's previous mark, it is not obvious from the record that the use of "exit" is so widespread (particularly in the United States, where these parties operate) as to suggest that it is descriptive or generic. As for the degree-

of-imagination test, that tips in LAH's favor as well: EXITUSA does not directly or immediately convey that LAH provides disengagement and deradicalization services. As LAH points out, EXITUSA literally sounds like a group that helps people exit the United States—not a group that helps people in the United States exit extremist hate groups. It takes a degree of thought and imagination to make that leap. *Cf. SportFuel*, 932 F.3d at 599-600 ("It requires no imaginative leap to understand that a company selling 'Sports Fuel' is selling a variety of food products designed for athletes.")

Finally, "No Judgment. Just Help." is not registered and so LAH cannot rely on the presumption. However, the mark is similarly suggestive because it does not immediately convey any ideas, characteristics, or qualities about LAH's services. And the evidence shows that it is used only by two parties—LAH and Free Radicals Project. Applying both tests, "No Judgment. Just Help." falls on the suggestive side of the line. Defendants do not address LAH's substantive arguments about "No Judgment. Just Help." and instead argue (without citation) that it should be excluded from the preliminary injunction because it was not included in LAH's original preliminary injunction motion papers. (*See* Dkt. 7-8; *see also* Dkt. 104 at 4 n.1.) Though Defendants are correct that LAH did not raise "No Judgment. Just Help." in its initial pleadings, it is mentioned in LAH's reply in support of its motion for a preliminary injunction and it was discussed at length in the preliminary injunction hearing. Defendants thus had notice that the phrase was included as part of LAH's trademark infringement claims, and Defendants had the opportunity to cross-examined witnesses about the phrase at the hearing and did so. (Hr'g. Tr. 445:2-447:4.)

Defendants have not presented sufficient evidence to overcome the presumption that LIFE AFTER HATE and EXITUSA are valid, protectable marks. And LAH has demonstrated that "No

Judgment. Just Help." is a suggestive, protectable mark. LAH has a greater than negligible chance of establishing that the marks are not merely generic or descriptive.

### b. Ownership of the marks

The ownership of the marks is disputed. In short, Picciolini claims that he co-founded LAH with Michaelis in 2009 and retained an ownership interest in the intellectual property he created and developed while he was a part of LAH, including the brand ExitUSA and the name Life After Hate. (*See* Dkt. 104 at 10-11.) LAH, for its part, claims that Michaelis founded LAH on his own, came up with the name "Life After Hate" on his own, and invited Picciolini to join later, and that all of the original Wisconsin Corporation's assets, including these marks, were assumed by LAH when LAH was incorporated as an Illinois nonprofit. (*See* Dkt. 105 at 4-7.)

"It is axiomatic in trademark law that ownership of a mark is predicated on priority of use in commerce." *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab.*, 859 F.3d 1023, 1027 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 366 (2017). Because this scenario is somewhat common, "[a] framework has developed in situations . . . where there has been a departure from or change of membership in a group, and both the departing member and the remnant group claim ownership of the mark." *Id.* at 1028 (citing McCarthy on Trademarks § 16:45). In these situations, courts consider: (1) the parties' objective intentions or expectations; (2) who the public associates with the mark; and (3) to whom the public looks to stand behind the quality of goods or services offered under the mark. *Id.* (citing *Wonderbread 5 v. Gilles*, 115 U.S.P.Q.2d 1296, 1305 (T.T.A.B. 2015)).

Given the circumstances of this case, the first factor is the most important. To that end, the record shows that the parties collectively intended to start two organizations named Life After Hate—the first was an online journal that was operated by the Wisconsin Corporation and later began providing outreach services, and the second was the Illinois nonprofit. In both cases, the

evidence shows that the parties intended that the groups would operate using the name "Life After Hate," not that Picciolini would render his own personal services using the mark. For example, Picciolini emailed Michaelis in November 2009 discussing the newly-formed online journal at LifeAfterHate.org and asked, "Where is your [meaning Michaelis's] name and plug? YOU are spearheading this effort, not me. I am honored to be a part, but the world has to know you are leading this project." (LAH Ex. 13.) Multiple witnesses also testified that the group, as a whole, decided to operate the Illinois nonprofit under the name "Life After Hate" during and shortly after the Dublin conference in 2011. There is no evidence in the record that Picciolini indicated to the rest of LAH that he owned the mark, that he had previously used the mark, or that he objected to the group using the name "Life After Hate." To the contrary, Picciolini repeatedly told Michaelis when Michaelis left the organization in 2012 that LAH's domains and social media accounts "belong[ed] to the organization" and that it would be confusing if Michaelis kept them for himself. To the extent Picciolini now believes that the mark belongs to him personally, that is belied by his actions from 2009 through 2017. *See Lyons*, 859 F.3d at 1030.

The record is similarly clear about ExitUSA. Multiple witnesses testified that the group decided to start using the ExitUSA moniker after McAleer's February 2014 trip to Europe when he encountered similarly branded international organizations. The available evidence indicates that the group intended to operate a program under the name ExitUSA, not that Picciolini would be providing exit services on his own under that name. Nor is there any evidence in the record that Picciolini believed he owned the ExitUSA mark in 2014, let alone that he communicated that to LAH. The same is true of "No Judgment. Just Help." The evidence shows that the tagline was created as part of Gravitytank's *pro bono* branding efforts for LAH, not for Picciolini individually. Witnesses testified that Gravitytank donated its services to LAH as an organization and that the

tagline was created as part of those efforts and was intended to be used for LAH's benefit, not for Picciolini's personally. There are no indications in the record that Picciolini believed the tag belonged to him when it was created or that he communicated that to LAH at the time.

As for the second two factors, the public's association with the marks and who the public relies upon to stand behind the quality of the services offered with the marks, the record shows that both factors favor LAH's ownership. From 2009 through 2017, LAH as an organization used the marks, rather than Picciolini individually. There is no evidence that Picciolini began using the marks in connection with his personal services until 2017, after the LAH had been using the marks for years. On that basis alone, it is clear that the public associated the marks with LAH as an organization, not with Picciolini individually.

Finally, Defendants argue that LAH is unlikely to succeed on the merits because it engaged in fraud when it registered the LIFE AFTER HATE and EXITUSA marks. To establish fraudulent procurement of the marks, Defendants must demonstrate that LAH "deliberately attempted to mislead the PTO by presenting materially false and misleading information when . . . appl[ying] for the[ ] trademark registration." *Slep-Tone Entm't Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898, 903 (N.D. Ill. 2014); *see also Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982). "A claim for fraudulent procurement of a trademark requires (1) [a] false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance." *Id.*, *see also* McCarthy on Trademarks § 31:61. "The very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence.

There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009).

According to Defendants, LAH fraudulently registered the LIFE AFTER HATE mark because it declared, under penalty of perjury, that its date of first use was 2011 and that no other party had the right to use the mark (or a close resemblance) in commerce, even though LAH knew about the previously existing Wisconsin Corporation called "Life After Hate" and that Michaelis had been using "My Life After Hate" in commerce as early as 2009. As to the Wisconsin Corporation, LAH's witnesses testified that they understood that the Wisconsin Corporation's assets were assumed by LAH. Even if this were not legally or technically accurate, LAH established that its members sincerely believed it to be the case, and fraud requires proof that LAH *knew* the representations it was making were false. There is no evidence showing that LAH knew or believed the Wisconsin Corporation had the right to use "Life After Hate" and declared otherwise in its trademark application—to the contrary, the evidence shows that LAH believed it assumed the Wisconsin Corporation's assets, including the trademark rights. As for Michaelis and his use of "My Life After Hate," there is no evidence in the record establishing LAH's knowledge of *when* he first used the title. It is absolutely clear from the record that Michaelis used the title in commerce, but there is no such clarity about when he began doing so, let alone clarity about when LAH knew and whether it knew when it applied to register the mark.

Defendants' fraud argument as to EXITUSA is flimsy at best. Defendants argue that Picciolini created the mark and LAH did not attempt to register it until 2017, after Picciolini left the organization, so LAH must have submitted the registration fraudulently. (*See* Dkt. 104 at 12.) Defendants have provided plenty of evidence that *Picciolini* believed he had the right to use EXITUSA in commerce, but they have not provided evidence that *LAH* believed as much, which

they must do to prove that LAH engaged in fraud.  Defendants do not come close to  proving fraud "'to the hilt' with clear and convincing evidence," as they must.  *In re Bose Corp.*, 580 F.3d at 1243.

For all these reasons, LAH has a greater than negligible chance of establishing that it owns the marks.

### c.      Likelihood of confusion

To decide if there is a likelihood of confusion, courts ask whether consumers who might use either product would likely attribute them to a single source.  *Uncommon*, 926 F.3d at 425. Courts use seven factors in making this decision: (1) the similarity between the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care consumers are likely to use; (5) the strength of plaintiff's mark; (6) actual consumer confusion; and (7) the defendant's intent to "palm off" its product as that of another.  *Id.* (citing *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015)).  No one factor is dispositive; however, "the similarity of the marks, the defendant's intent, and actual confusion" are usually most important. *Id.* (citing *Packman*, 267 F.3d at 643).

### 1.  Similarity between the marks

For the most part, the similarity of the marks is not disputed.  Picciolini admitted to redirecting the ExitUSA.org domain to his personal website, which was promoting competing services.   Witnesses testified that Picciolini's site (and later, Free Radicals Project's site) featured the phrases "There is life after hate," "Life After Hate" and "ExitUSA," which Defendants did not rebut.  LAH introduced an exhibit showing the phrase "No Judgment. Just Help." appearing on the Free Radicals Project website.  (LAH Ex. 39.)  The marks at issue here were virtually identical and this factor weighs in LAH's favor.

### 2. Similarity of the services

The similarity of the competing services offered is also not disputed.  Both LAH on the one hand, and Free Radicals Project and Picciolini on the other offer deradicalization, disengagement, and "exit" services, aimed at educating and providing social services to individuals looking to leave extremist hate groups.  Picciolini testified that Free Radical Project was not operational because it was awaiting 501(c)(3) status (*see* Hr'g Tr. 264:5-14) but Picciolini himself advertised competing "exit' services on his personal website before he started Free Radicals Project and promoted Free Radicals Project in media interviews.  This factor weighs in LAH's favor.

### 3. The area and manner of concurrent use

To determine whether a product or service is within the same area and manner of concurrent use, courts consider: (1) the relative geographic distribution areas; (2) whether there is direct competition between the products or services; and (3) whether the product is sold through the same marketing channels.  *See Ty*, 237 F.3d at 900.  There is little evidence in the record regarding the area of use.  Both parties primarily advertise their services online, serve the same niche audience, and provide the same highly specialized service.  That indicates that there is direct "competition" for these services, to the extent two nonprofit organizations both seeking to help troubled individuals disengage from extremist hate groups can be said to be "competing" over clients.  Defendants again argue that Free Radicals Project was not operational, but that assertion rings hollow in light of Picciolini's personal offers to provide similar services and Free Radicals Project's efforts to publicize the organization.  This factor also weighs in LAH's favor.

#### 4. The degree of care consumers are likely to use

LAH argues that because these services are free, consumers will exercise a lower degree of care in selecting a provider. *See, e.g., Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 739 (7th Cir. 2013) (consumers generally exercise less care when purchasing inexpensive products). But in this context, the price (or lack thereof) of the services is much less important than the nature of the services. As LAH's own witness testified, "providing private and confidential services is really the basis of the trust we're establishing with the people we serve . . . The people we're trying to help are already very paranoid and afraid and skittish. They're trying to hide the idea that they're trying to change." (Hr'g Tr. 91:4-24.) The same witness testified that LAH's services are sensitive, private, and required LAH to establish trust with its clients. (*Id.* 43:23-44:13.) This testimony makes clear that consumers of these services are likely to exercise a high degree of care when choosing a service provider. This factor weighs in Defendants' favor.

#### 5. The strength of the marks

As discussed at length above, these marks are each descriptive and LAH has presented evidence that the public associates them with LAH. For those reasons, the marks are strong and this factor weighs in LAH's favor.

#### 6. Actual consumer confusion

LAH presented four instances of actual confusion—separate questions from Brette Steele and Erin Wilson of the Department of Homeland Security about "what was happening" with Life After Hate and ExitUSA, questions from a journalist about whether LAH or Picciolini controlled ExitUSA, and questions from a member of one of LAH's support groups about what was happening with ExitUSA and who was running the program. Defendants contend that a journalist

cannot be considered a "consumer" of LAH's services. Some courts have recognized that confusion of non-purchasers can be relevant to the likelihood-of-confusion analysis. *See, e.g.*, *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 16 (1st Cir. 2004) ("We also hold that the likelihood of confusion inquiry is not limited to actual or potential purchasers, but also includes others whose confusion threatens the trademark owner's commercial interest in its mark.") The Court need not resolve that issue, because even setting aside the journalist example, LAH has still presented three other instances of actual confusion, which are "entitled to substantial weight in the likelihood of confusion analysis." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001). This factor thus weighs strongly in LAH's favor.

### 7. The Defendants' intent

The evidence here is strong that Picciolini and Free Radicals Project intentionally copied LAH's marks. Picciolini was undoubtedly aware that LAH was using the marks. Even more troubling, Picciolini twice asked LAH to "spin off" ExitUSA to him to run as a separate entity. LAH twice refused, and shortly after Picciolini was terminated, he began using ExitUSA marks, logos, and slogans. And Picciolini received a cease-and-desist letter about the marks and continued using them anyway. None of these facts is dispositive on its own, but when considered as a whole, the evidence indicates that Picciolini and Free Radicals Project intentionally copied LAH's marks.

Taking these factors as a whole, LAH has a greater than negligible chance of showing a likelihood of confusion. Because LAH also has a greater than negligible chance of showing that it owns valid, protectable marks, the Court finds that LAH has good chance of succeeding on the merits. *See Ty*, 237 F.3d at 897. Indeed, given the overlap between the parties' customers, the

strong similarity between the services and the marks, and the evidence of actual confusion, LAH has a strong likelihood of succeeding on the merits of its infringement claim.

## II.     Irreparable harm and adequacy of legal remedies

"[I]t is well-settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002), *as amended* (Oct. 18, 2002); *see also, e.g.*, *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 952 (N.D. Ill. 2018) ("The Seventh Circuit traditionally has applied a presumption of irreparable harm in false advertising and trademark infringement suits.")  The presumption can be rebutted, however, by a showing that plaintiff unreasonably delayed in seeking preliminary injunctive relief. *Ty*, 237 F.2d at 903.  ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered.")

Defendants argue that LAH's delay in seeking a preliminary injunction demonstrates that it will not suffer irreparable harm if that relief is denied.  As Defendants point out, LAH learned in August 2017 (shortly after Picciolini's termination) that the ExitUSA.org domain was automatically redirecting users to ChristianPicciolini.com/ExitUSA, which featured ExitUSA logos and slogans, but it did not file this lawsuit and seek injunctive relief until October 2018—a delay of 14 months.  Though it is a close call, Defendants' delay argument falls short.

"A lengthy, *unexplained* delay in seeking relief calls into question 'how urgent the need for [preliminary] equitable relief really is.'" *Redbox*, 310 F. Supp. 3d at 953 (quoting *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011) (emphasis added).  *See Redbox*, 310 F. Supp. 3d at 953-54 (unexplained 18-month delay in filing suit precluded finding of irreparable harm); *see also, e.g.*, *Checker Car Club of Am., Inc. v. Fay*, 262 F. Supp. 3d 621, 629-30 (N.D. Ill.

2017) (over a year); *Ixmation, Inc. v. Switch Bulb Co.*, No. 14 C 6993, 2014 WL 5420273, at *7-8 (N.D. Ill. Oct. 23, 2014) (four-and-a-half months); *MB Fin. Bank, N.A. v. MB Real Estate Servs.*, No. 02 C 5925, 2003 WL 22765022, at *8 (N.D. Ill. Nov. 21, 2003) (eight months). "A recent survey of federal trademark decisions concluded that 'if the delay is greater than 12 months, preliminary injunctive relief is usually denied.'" *Redbox*, 310 F. Supp. 3d at 953 (citing McCarthy on Trademarks § 31:31).

That said, the length of the delay, on its own, is not dispositive. A lengthy delay might not undermine an irreparable harm claim if the delay was caused by "the plaintiff's making good faith efforts to investigate the alleged infringement." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). Similarly, "[w]hether the defendant has been lulled into a false sense of security or had acted in reliance on the plaintiff's delay influences whether [courts] will find that a plaintiff's decision to delay in moving for a preliminary injunction is acceptable or not." *Ty*, 237 F.3d at 903 (quotations omitted).

Here, LAH provided an explanation for the 14-month delay—after it discovered the infringement, LAH quickly hired an attorney to help it submit applications to the USPTO, hired another attorney who sent Picciolini and cease-and-desist letter, and attempted to regain control of the ExitUSA.org domain. More time passed while LAH waited on the results of its USPTO applications and found a third set of attorneys to assist it in bringing its claims, but once it secured new counsel, it promptly brought this suit. Though 14 months is certainly pushing the limit, LAH demonstrated that it was making good faith efforts during that time to investigate and prosecute its trademark rights. And Defendants cannot credibly argue that they were "lulled into a false sense of security by the delay," given that LAH sent Picciolini a cease-and-desist letter in September 2017 and declined Picciolini's invitation to discuss a division of assets between them.

*See, e.g.*, *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 887-88 (N.D. Ill. 2008) ("delay is only relevant to the extent that [plaintiff] lulled [defendant] into a 'false sense of security,'" and plaintiff's cease-and-desist letter to defendant was evidence that there was no such lulling).

LAH's delay in seeking preliminary injunctive relief does not defeat its claim of irreparable harm. As discussed above, LAH has suffered injury to its reputation and consumer goodwill through Defendants' use of its marks. Due to the difficulty in assessing damages associated with a loss of goodwill, it is presumed that those damages are irreparable and that LAH lacks an adequate remedy at law. *Promatek*, 300 F.3d at 813.

**III.     Balancing the harms**

The balance of hardships favors LAH. The Court balances "the irreparable harm that [Defendants] will suffer if preliminary relief is granted . . . against the irreparable harm [LAH] will suffer if relief is denied." *Ty*, 237 F.3d at 895. Using a "sliding scale" approach, "the more likely [LAH] will succeed on the merits, the less the balance of irreparable harms need favor" its position, and vice versa. *Id.* (citing *Abbott Labs*, 971 F.2d at 12). The sliding scale approach "is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Id*. Because the Court finds that LAH has a strong likelihood of succeeding on the merits of its claims, it is not critical that the balance of hardships favors LAH. Still, Defendants have not identified any meaningful harm they will incur as a result of the injunction being granted. (*See* Dkt. 62 at 18-19, Dkt. 104 at 22.) They argue that an injunction will damage Picciolini's goodwill and reputation in the anti-extremism community, but they do not explain *how* that damage will emanate from the injunction. They simply conflate an injunction with loss of goodwill and

standing in the community. Weighing that speculative, conclusory assertion against the presumptively irreparable harm LAH will suffer if Defendants' continue to use its marks, a preliminary injunction is appropriate here.

## IV.  Public interest

Finally, the Court must consider the public interest in denying or granting the injunction. *Ty*, 237 F.3d at 895. Enforcement of trademark law serves the public interest by reducing consumer confusion. *Promatek*, 300 F.3d at 813-14. On the other hand, "trademark protection should not interfere with traditional policies of a competitive market." *Platinum*, 149 F.3d at 726. Here, Picciolini points to the fallout from his losing access to his LAH email, databases, and contacts and argues that his "ability to prevent dangerous violence and extremism" would be chilled if this injunction were granted. (Dkt. 104 at 22.) But those resources are not at issue in this injunction. All the injunction will do is prevent Picciolini and Free Radicals Project from using LAH's trademarks to promote their own services. Picciolini can continue to perform the important work of preventing dangerous and violent extremism (and the Court sincerely hopes that he will), but he must do so without using LAH's trademarks. Because an injunction will reduce consumer confusion and will not hinder Picciolini or Free Radicals' Project's ability to perform their work, the public interest is served by granting this injunction.

## V.  Preliminary Injunction

Effective immediately, Defendants and their agents, successors, assigns, and all persons or entities acting in concert or participation with the them who receive actual notice of this Order by personal service or otherwise, are restrained and enjoined for the pendency of this lawsuit from directly or indirectly using or permitting the use of the terms "LIFE AFTER HATE," and/or

"EXITUSA," or "No Judgment. Just Help." (or any variation thereof) in connection with any goods or services online or offline.

Defendants are specifically preliminary enjoined from:

a.      Directly or indirectly using or permitting the use of the www.exitusa.org domain name for any other purpose other than to create a landing page that states: "For those seeking Life After Hate, Inc., please go to www.lifeafterhate.org/exitusa";

b.      Directly or indirectly using the @exitusateam Twitter handle and account;

c.      Directly or indirectly using the ExitUSA and Life After Hate YouTube Channels;

d.      Directly or indirectly using Plaintiff's videos, including Plaintiff's "There is Life After Hate" video, without a disclaimer conspicuously stating "This video is owned by and is used with the permission of Life After Hate, Inc. Free Radicals Project, Inc. is not in any way affiliated with Life After Hate, Inc.;

e.      Directly or indirectly using or permitting the use of the phrases "Life After Hate," "ExitUSA," and/or "No Judgment. Just Help." (or any close or confusingly similar variations thereof) on any website or social media account, except for in the limited, fair use manner that sufficiently limits and/or dispels any likelihood of confusion (*e.g.*, Defendants may state in Picciolini's biography that he co-founded Life After Hate, Inc., but he must also explicitly state that he "no longer works for and is no longer affiliated with "Life After Hate, Inc." or "ExitUSA."); and

f.      Directly or indirectly holding themselves out in any manner as the source of or otherwise affiliated with Life After Hate, Inc.'s services or ExitUSA services, including but not limited to any presentations, speeches, and online and offline content; furthermore, if Defendants mention "Life After Hate" or "ExitUSA" above, they shall explicitly communicate that Defendants are no longer associated with or affiliated with Life After Hate, Inc. or ExitUSA.

## VI.    Bond

Under Federal Rule of Civil Procedure 65(c), "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Absent extraordinary circumstances, the court errs in not granting" a defendant's request for a bond. *Reinders Bros. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980). "The purpose of an injunction bond is to compensate

29

the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Ty*, 292 F.3d at 516 (7th Cir. 2002). Defendants have not yet made a bond request and neither party has addressed this issue. Defendants must estimate the costs they will incur as a result of this injunction and file a bond request within seven days of the entry of this order.

## CONCLUSION

For these reasons, LAH's motion for a preliminary injunction [Dkt. 7] is granted. LAH's motion to admit certain exhibits into evidence [Dkt. 100] and Defendants' motion to strike portions of Angela King's deposition testimony and certain exhibits [Dkt. 112] are both granted in part and denied in part, as discussed above in footnote 2. Defendants shall file a bond request within seven days of the entry of this order.

Virginia M. Kendall
United States District Judge

Date: September 30, 2019